In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2608

CENTRAL STATES SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,
et al.,

*Plaintiffs-Appellees*,

*v.*

O'NEILL BROS. TRANSFER & STORAGE
CO., an Illinois corporation,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-05220—**Samuel Der-Yeghiayan,** *Judge.*

ARGUED DECEMBER 11, 2009—DECIDED AUGUST 31, 2010

Before BAUER, RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Central States Southeast and
Southwest Areas Pension Fund ("Central States") brought
this action against O'Neill Bros. Transfer & Storage
Company ("O'Neill"), seeking interim payment of with-
drawal liability under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The district court granted summary judgment for Central States, and O'Neill appeals. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

A multiemployer pension plan is created when various employers agree to make contributions to a common pension fund on behalf of their respective employees. Congress has recognized that the reliability of multi-employer pension funds is of extreme importance to the workers who rely upon them and of vital importance to the economic and social well-being of the Nation. To achieve and maintain the requisite level of financial security, multiemployer pension plans must maintain adequate funding levels to ensure their capacity to fund the benefits of workers who have a legitimate expectation that those funds will be available to meet their needs. The Multiemployer Pension Plan Amendments Act ("MPPAA" or "the Act"), an amendment to ERISA, there-fore requires that an employer pay "withdrawal liabil-ity" if it withdraws from a multiemployer pension fund. The Act provides a mechanism for calculating the amount of withdrawal liability and the schedule ac-cording to which it should be paid. *See* 29 U.S.C. §§ 1391, 1399(c)(1), (3). The mechanism calculates the amount of liability to equal the employer's proportionate share of

the plan's unfunded vested benefits;[1] the amount of each annual payment is roughly equal to the withdrawing employer's typical past contributions. *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 418 (1995). Congress conceived of withdrawal liability as a substitute for the annual payments that an employer would have made had it not withdrawn. *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus.*, 252 F.3d 911, 918 (7th Cir. 2001) (citing *Milwaukee Brewery*, 513 U.S. at 418-19). The statutory mechanism seeks to maintain level funding for the plan, despite the employer's withdrawal. *Milwaukee Brewery*, 513 U.S. at 419.

The Act provides that, in addition to calculating withdrawal liability, the pension plan also must calculate an installment schedule in accordance with 29 U.S.C. § 1399(c). The employer may seek review of these calculations and then challenge the plan's determination in arbitration, but it must pay even while the review and arbitration are pending. 29 U.S.C. §§ 1399(c)(2), 1401(d). Thus, payment is placed ahead of decision. *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 118 (7th Cir. 1991). Of course, if the employer eventually prevails in its challenge, overpayments are returned to it. *See* 29 U.S.C. § 1401(d).

---

[1] Unfunded vested benefits are the difference between the vested benefits being paid and to be paid in the future, and the current value of the plan's assets. *Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 609 (1993).

To further ensure the financial stability of the plan, the statute specifically provides that, in the event of a default, the pension plan may demand immediate payment of the outstanding amount of withdrawal liability. *Id.* § 1399(c)(5). The statute provides two definitions of default:

> (A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

> (B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

*Id.* The Pension Benefit Guaranty Corporation ("PBGC") has promulgated a regulation that provides, among other things, that "[a] default as a result of failure to make any payments shall not occur until the 61st day after" the issuance of the arbitrator's decision. 29 C.F.R. § 4219.31(c)(1).

With this description of the underlying statutory scheme in mind, we now shall turn to the facts of the case.

**B.**

Central States administers a multiemployer pension fund. O'Neill was, until early 2007, one of the employers who contributed to the fund. At that time, however, O'Neill ceased operations and informed Central States that

the company was "'preparing for its termination and liquidation.'" R.35, Attach. 1 at 3. Central States deemed this notification a withdrawal; furthermore, because O'Neill was liquidating, Central States, acting under the terms of the plan, deemed O'Neill to be in default and required immediate payment of the entire amount of the withdrawal liability. *See* 29 U.S.C. § 1399(c)(5)(B).

On May 16, 2007, Central States sent O'Neill a letter demanding "immediate payment of the entire amount due." R.35, Attach. 1 at 19.[2] On August 16, 2007, Central States sent O'Neill a second letter that revised upward the amount of withdrawal liability to $1,689,191.36; this increase was due to a revision in the total amount of unfunded vested benefits.

On September 14, 2007, Central States filed its original complaint in the district court. It sought an interim payment of the entire amount of the withdrawal liability owed by O'Neill. O'Neill then moved for a dismissal or a stay of proceedings pending the outcome of mandatory arbitration.

Pretrial proceedings before the district court took several twists and turns. The district court first ordered the complaint amended in order to clarify that Central States was, in fact, seeking only interim payment. Consequently, O'Neill did not file an answer until April 2008. One month later, Central States moved for summary judgment.

---

[2] The letter states that it includes "[a] copy of . . . the minimum required payment schedule," R. 35, Attach. 1 at 19, but such copy is not included in the record.

In October 2008, the district court denied summary judgment without prejudice; the court stated that "the record does not reflect whether O'Neill Company is able to make payments in the form of a payment schedule as opposed to a lump sum payment." R.40 at 1. It ordered Central States to offer O'Neill a "feasible payment schedule" if Central States had not already done so. *Id.* at 1-2. In response to this order, on December 12, 2008, Central States calculated and submitted a payment schedule, as required by 29 U.S.C. § 1399(c)(1). Under that schedule, the first payment was due on September 1, 2007.

In February 2009, the district court ordered Central States to submit another schedule comprised of future due dates.[3] Central States complied and submitted what was essentially the same schedule, except that payments did not begin until April 5, 2009, one month after the filing was submitted. O'Neill then filed a response in which it contended that this schedule violated the statute because it called for payments to begin less than 60 days after the schedule was provided. It asked that the schedule be stricken.

On April 1, the district court granted summary judgment for Central States. The court took the view that O'Neill "in effect, ha[d] rejected the proposed payment schedule," R.51 at 4-5, and that O'Neill's liquidation

---

[3]  In the interim, O'Neill had paid the first installment. R.48 at 3. As far as the record reveals, that payment represents the only money paid to Central States since O'Neill was determined to be in default.

presented "an immediate and compelling need for O'Neill Company to provide a lump sum payment to Plaintiffs at this juncture to protect such funds," *id.* at 5.

The parties then filed cross-motions to alter the judgment. On May 27, the court granted Central States' motion, adding interest and liquidated damages to the judgment, bringing the total to $2,243,529.03. The court denied O'Neill's motion. It rejected the argument that it had entered summary judgment *sua sponte* because Central States' original motion had been fully briefed. The court also clarified that Central States "had provided O'Neill with a proper demand for payment in compliance with ERISA prior to bringing this action," *id.* at 6, and that O'Neill never had notified the court that it accepted the revised payment schedule.

## II

## DISCUSSION

### A.

O'Neill now submits that it had no obligation to pay the *entire* amount due during the pendency of arbitration. Interim payments, O'Neill contends, are necessarily *installment* payments, and, even in case of a default, there can be no acceleration until arbitration is complete.[4]

---

[4] O'Neill also attacks the district court's conclusion that Central States provided a valid payment schedule. In this regard, it argues that the Act provides that the first payment is not due

(continued...)

Central States, for its part, makes little attempt to defend the district court's reasoning. Rather, it submits that summary judgment should have been granted when its motion was first filed, before the briefing about a feasible payment schedule. It contends that the default provisions of the statute are *separate* from the interim payment provisions, and it is the *default* provisions that operate to allow immediate acceleration. For a default under § 1399(c)(5)(B), the kind of default at issue here, acceleration may occur even while arbitration is pending. Therefore, Central States contends, it is entitled to payment of the entire amount due on an interim basis.

Because this case involves important issues in the administration of the ERISA statute, we invited the PBGC to file a brief as amicus curiae.[5]

---

[4]  (...continued)

until 60 days after the schedule is provided. The schedule submitted by Central States called for the first payment to be due 30 days after it was provided. O'Neill also makes other arguments that, as we shall see, we need not address. O'Neill argues that it had not defaulted on a payment schedule because mere objection is not a default under the Act. O'Neill also challenges the internal consistency of the district court's reasoning, asks for attorney's fees and argues that the reinstatement of summary judgment without additional briefing was improper.

[5]  The court expresses its thanks to the PBGC for accepting its invitation and submitting a fine brief which has been of great assistance to the court.

**B.**

In construing a statute, we must, of course, start with the words of the statute itself. In the opening section of this opinion, we set forth, in broad strokes, the statutory scheme that constitutes the decisional framework for the case before us. Now, as we begin our discussion of the parties' precise contentions, a more explicit statutory analysis is required. Therefore, we return to the statute and focus on the text.

**1.**

The MPPAA ordinarily provides for an employer to pay its withdrawal liability according to a schedule, calculated by the pension fund in accordance with the statutory formula. 29 U.S.C. § 1399(c)(2). A default, however, has special consequences. As noted earlier, the MPPAA provides for two kinds of default and states the consequences of either kind. Specifically, 29 U.S.C. § 1399(c)(5) provides:

> In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means—
>
> > (A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within

60 days after the employer receives written notification from the plan sponsor of such failure, and

(B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

This case concerns the second kind of default, commonly referred to as an "insecurity default." Notably, the first kind of default, commonly referred to as a "missed-payment default," is not at issue in this case.

Subsection B, set forth immediately above, allows pension plans to adopt rules specifying examples of events that indicate a "substantial likelihood" of inability to pay. When these events occur, the plans may accelerate the entire amount of withdrawal liability. *Id.* § 1399(c)(5); *see also* 29 C.F.R. § 4219.31(b)(1) (defining "default" in nearly identical language).

Here, the plan's Appendix E, entitled "Rules and Regulations Pertaining to Employer Withdrawal Liability," section 5(e)(2), provides that a default occurs if:

The Trustees, in their discretion, deem the Fund insecure as a result of any of the following events with respect to the Employer:

(A) the Employer's insolvency, or any assignment by the Employer for the benefit of creditors, or the Employer's calling of a meeting of creditors for the purpose of offering a composition or ex-

tension to such creditors, or the Employer's appointment of a committee of creditors or liquidating agent, or the Employer's offer of a composition or extension to creditors, or . . .

(C) the commencement of any proceedings by or against the Employer . . . pursuant to any bankruptcy or insolvency laws or any laws relating to the relief of debtors, or the readjustment, composition or extension of indebtedness, or to the liquidation, receivership, dissolution or reorganization of debtors; . . .

(E) any other event or circumstance which in the judgment of the Trustees materially impairs the Employer's credit worthiness or the Employer's ability to pay its withdrawal liability when due.

R.35, Attach. 1 at 13.

O'Neill, through counsel, informed Central States by e-mail that O'Neill "was 'preparing for its termination and liquidation.'"[6]  R.35, Attach. 1 at 3. In response to this news, Central States, acting pursuant to this provision, determined that the fund was insecure, placing O'Neill in default pursuant to the plan rules. The plan determined that in ceasing operations, O'Neill had

---

[6]  O'Neill admits that it ceased doing business, but denies that it sent this e-mail. R.37 ¶ 8. However, it puts forth no evidence that supports this denial—not even an affidavit stating that O'Neill sent no such e-mail. In any event, the ceasing of operations was the essential component of the default.

shown a substantial likelihood that it would be unable to pay its withdrawal liability.

The MPPAA provides that "[a]ny dispute between an employer and the plan sponsor . . . concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). O'Neill therefore concedes that the propriety of the plan's default determination is beyond the scope of our review at this juncture. *See* Reply Br. 5 ("Whether Central States is correct in its determination regarding its withdrawal liability assessment and the existence of a default making said assessed amount immediately due and owing are questions relating to the merits of the underlying dispute which must be resolved by an arbitrator.").[7]

Subsection 1399(c)(5) states that "a plan sponsor may require immediate payment" in the event of default; Central States made such a demand. We therefore must resolve whether the default provisions of § 1399(c)(5) apply during the pendency of the arbitration proceeding.

---

[7] We note that the plan rules never specifically define "liquidation" as grounds for a default. We also note that in the preamble to the final version of its regulation, the PBGC stated that "[s]uch a substantial likelihood [of default] would exist, for example, when an employer declares bankruptcy, makes an assignment for the benefit of creditors, or begins liquidating all of its assets." 49 Fed. Reg. 22644 (May 31, 1984).

**2.**

At the outset, it is important to note that, even in the absence of a declaration of default, withdrawal liability is ordinarily payable during the pendency of the arbitration. The statutory language requires that the employer pay even while challenging the plan's determination; if the employer prevails on its challenge, it will get its money back. Two statutory provisions speak to this procedure, sometimes referred to as "pay now, dispute later." Subsection 1399(c)(2), the provision of the statute that discusses payment, states that:

> Withdrawal liability shall be payable in accordance with the schedule set forth . . . notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

29 U.S.C. § 1399(c)(2). Similarly, § 1401(d), which relates specifically to arbitration, states that:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision . . . .

*Id.* § 1401(d).

These provisions are not redundant. Subsection 1399(b)(2) provides that the employer may request a review by the plan sponsor; section 1401 provides for arbitration. The two processes are different. Nevertheless, the provisions are analogous, and, notably, both make clear that payment must begin immediately and is not suspended during challenge.

**3.**

Having concluded that § 1399(c)(2) and § 1401(d) place no restrictions on a plan's ability to declare a default during the pendency of arbitration, we turn to the default provision itself. We set forth § 1399(c)(5) for ease of reference:

> In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means—
>
> > (A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and
> >
> > (B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

*Id.* § 1399(c)(5).

We pause, first of all, to note the structure of the provisions. They consist of a general paragraph, which we shall refer to as the "main body" of the section, and two alternative definitions of default. There is nothing in the text of the main body of the provision, or in subsec-

tion (B), suggesting any kind of limitation on when acceleration can occur. In these parts of the text, there is no indication that default payments should be treated differently from any other withdrawal liability payments, which must be made before the decision on liability is made. These provisions, then, echo the general rule of "pay now, dispute later," and in no way indicate that acceleration due to default is an exception to this general rule.

The PBGC has given a different interpretation to subsection (A), which deals with default due to non-payment. Addressing directly the matter in 29 C.F.R. § 4219.31(c), the PBGC's regulation provides that "[a] default *as a result of failure to make any payments* shall not occur" until 61 days after the arbitrator rules. *Id.* (emphasis supplied). This regulation, then, interprets the statutory command of section 1399 (c)(5)(A) as requiring a method of proceeding different from the "pay now, dispute later" approach of the remainder of the statute. The PBGC reaches this conclusion by focusing on the distinctive wording of subsection (A), the statute's definition of a missed-payment default. More precisely, it focuses on the words "when due." It then points out that section 1401(b)(1) provides that "[i]f no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor . . . shall be *due and owing* on the schedule set forth by the plan sponsor." 29 U.S.C. § 1401(b) (emphasis supplied). In its view, "due" is a technical term employed by the Act. Payments become "due" when they become final, either because arbitration has not been initiated or has concluded. Payments not "due" are interim payments.

Rather, interim payments shall be made as specified by section 1401(d), but cannot serve as the basis for a missed-payment default. By definition, a missed-payment default cannot occur until payments become "due."

Notably, the PBGC also stresses that no such language appears in subsection (B) of section 1399(c)(5). That sub-section, at issue in this case, contains no reference to whether a payment is "due." It refers only to "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(B). It contains no other restrictions on a plan's ability to declare this type of default. Indeed, in its preface to the regulation, the PBGC explicitly notes that subsection (B)'s text requires a different analysis than the text of subsection (A). That preface reads in pertinent part:

> In terms of a plan's authority to declare a default during arbitration, the regulation distinguishes between an employer's failure to make a pay-ment and a plan determination that there is a substantial likelihood of the employer's inability to pay *its total withdrawal liability*. Such a substantial likelihood would exist, for example, when an employer declares bankruptcy, makes an assign-ment for the benefit of creditors, or begins liquidat-ing all of its assets; mere failure to make a pay-ment would not necessarily indicate this substan-tial likelihood of inability to pay the full liability. In the former situations, unlike in the case of a

> missed payment, a plan's ability to collect with-
> drawal liability may very well depend on its
> power to declare a default and accelerate the full
> liability. Therefore, PBGC believes it is important
> for the protection of plans that they be able to
> exercise this power *at any time*, even during plan
> review or arbitration.

49 Fed. Reg. 22644 (May 31, 1984) (second emphasis
supplied).

The PBGC is the agency charged with the administra-
tion of the withdrawal liability provisions of the
MPPAA. Its views on difficult interpretative problems
regarding the statute are worthy of substantial deference.
*Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837,
843 (1984). Here, because the interpretation set forth in
the preface is so inextricably related to the regulation
itself, we believe that it is worthy of deference as an
interpretation of the regulation. It is neither "plainly
erroneous or inconsistent with the regulation." *Auer v.
Robbins*, 519 U.S. 452, 461 (1997) (internal quotation
marks omitted). The fact that much of the PBGC's elab-
oration of its analysis is presented in an amicus brief
does not make its position bereft of all deference. Its
view is not a simple " '*post hoc* rationalizatio[n]' " advanced
by an agency seeking to defend past agency action
against attack. *Id.* at 462 (quoting *Bowen v. Georgetown
Univ. Hosp.*, 488 U.S. 204, 212 (1988); brackets in original).
Rather, it represents "the agency's fair and considered
judgment on the matter in question." *Id.* It is a reasoned
elaboration of the agency's earlier explanation of its
own regulation.

We believe, moreover, that the PBGC's interpretation of the statute is a reasonable reading of the statutory text. It is compatible with the overall Congressional intent of the statutory scheme. With respect to subsection (B), the PBGC's view is essentially that, when an event occurs indicating a substantial likelihood that the employer will be unable to pay its withdrawal liability, "the risk of nonpayment is especially acute." Amicus Br. 10. The "employer's election to arbitrate will not mitigate" that risk. *Id.* at 12. "[T]he purpose of section 1399(c)(5)(B) is to allow multiemployer plans to protect themselves and their participants against events indicating a substantial likelihood of an employer's inability to pay its withdrawal liability . . . ." *Id.* If there is a substantial likelihood that an employer will be unable to meet its obligations, then there is a need for urgent action that is not present if the employer simply misses a payment. In the former situation, if the fund is unable to collect quickly, it likely never will collect. The fund, and the employees whose pensions it serves, therefore would be unprotected. Because the PBGC's reading of the default provision is a reasonable interpretation of an ambiguous statutory text and compatible with the manifest intent of the statute when read as a whole, we must accord it deference. *Chevron U.S.A.*, 467 U.S. at 843.[8]

---

[8] In *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Century Motor Freight*, 125 F.3d 526 (7th Cir. 1997), we had to determine whether a request for arbitration prevented acceleration in the case of a missed-
(continued...)

8  (...continued)

payment default. We focused on the language in the main body of 29 U.S.C. § 1399(c)(5), which provides the consequences of a default, as it related to § 1401. We gave no weight to the fact that 29 U.S.C. § 1399(c)(5) has two branches, each describing a different type of default. We did so, no doubt, because the overarching question before us was not the definition of default, but rather the consequences of default. The main body of 29 U.S.C. § 1399(c)(5) deals with those consequences and, read alone, signals no distinction between the two kinds of default. Our focus on the main body prevented us, however, from taking into account that the section, when read as a whole, deals with two very different types of default, missed-payment default and insecurity default. We therefore did not consider whether any distinction between the two kinds of default was justified. In *Century Motor Freight*, this lack of focus on the two kinds of default was not detrimental to the outcome because the default at issue was a missed-payment default and the statute, as interpreted by the regulation, restricts acceleration in such cases. Here, however, where we are dealing with an insecurity default, the regulation provides for no such restriction.

In *Century Motor Freight*, we noted that we were dealing with this complex statute and its accompanying regulation without the assistance of the PBGC. 125 F.3d at 534 ("As we have noted, the PBGC was not asked to participate in this suit, and we would have found its input beneficial."). Here, faced with the application of the same statutory and regulatory provisions to an insecurity default as opposed to a missed-payment default, we have invited the participation of the PBGC and have had occasion to study in more depth the

(continued...)

### Conclusion

O'Neill's default is governed by the provisions of 29 U.S.C. § 1399(c)(5)(B). Under that section, as interpreted reasonably by the PBGC, the entire amount of the withdrawal payment is immediately payable upon default and that obligation is not deferred because of the pendency of arbitration. Therefore, although we express a rationale different from that articulated by the district court, its judgment must be affirmed.

AFFIRMED

---

[8] (...continued)

relationship between the statutory scheme taken as a whole and the accompanying regulation.

Our interpretation of the second branch of 49 U.S.C. § 1399(c)(5) has been presented to the court under Circuit Rule 40(e). No judge in active service has requested a vote to hear this case en banc.

---