11-1322-cv
Trustees of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

(Argued: March 26, 2012      Decided: August 17, 2012)

Docket No. 11-1322-cv

---------------------------------------------------x

TRUSTEES OF THE LOCAL 138 PENSION TRUST FUND,

Plaintiff-Appellant,

-- v. --

F.W. HONERKAMP CO. INC.,

Defendant-Appellee.

---------------------------------------------------x

B e f o r e :  WALKER, LYNCH and LOHIER, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge) granting defendant-appellee employer's motion for summary judgment dismissing claim by plaintiff-appellant -- trustees for a pension plan who sought certain pension contributions from the employer -- and denying the trustees' cross-motion for summary judgment.  The trustees argue that the Pension Protection Act of 2006 prevented the employer from withdrawing from the pension plan after the plan entered critical status, and that the district court erred in concluding otherwise.  We do not agree and thus AFFIRM the judgment of the district court.

1

LARRY CARY (Andrew M. Katz and Charles Pergue, on the brief), Cary Kane LLP, New York, NY, for Plaintiff-Appellant.

KEVIN L. WRIGHT, Littler Mendelson, P.C., McLean, VA (Deidre A. Grossman, Littler Mendelson, P.C., New York, NY, on the brief), for Defendant-Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-appellant Trustees (the "Trustees") of the Local 138 Pension Trust Fund (the "Fund") appeal from a decision of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge) granting summary judgment in favor of defendant-appellee F.W. Honerkamp Co. ("Honerkamp") and denying the Trustees' cross-motion for summary judgment. Honerkamp withdrew from the Fund after the Fund had reached "critical status" as defined by the Pension Protection Act of 2006 (the "PPA"), an amendment to the Employee Retirement Income Security Act of 1974 ("ERISA"), and after the collective bargaining agreements ("CBAs") requiring Honerkamp to contribute to the Fund had expired. The Trustees sued, arguing that the PPA prevented Honerkamp from withdrawing and required the company to make certain ongoing pension contributions pursuant to the Fund's rehabilitation plan. The district court agreed with Honerkamp that the PPA did not forbid its withdrawal or require those contributions. It therefore granted summary judgment to

2

Honerkamp and denied the Trustees' cross-motion for summary judgment.

On appeal, the Trustees argue that the district court misconstrued the PPA in denying their cross-motion and granting summary judgment to Honerkamp. For the reasons that follow, we reject the Trustees' argument and AFFIRM the judgment of the district court.

**BACKGROUND**

**I. Statutory Background**

We begin with an overview of the pertinent statutory framework, which provides necessary context for the events of this case:

**A. ERISA**

ERISA is a comprehensive statutory scheme regulating employee retirement plans. See generally ERISA § 2 et seq., 29 U.S.C. § 1001 et seq. Congress has amended the law periodically since originally enacting it in 1974.

Among other things, ERISA "was designed to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 214 (1986) (internal quotation marks omitted). To that end, the statute created an agency, the Pension Benefit Guaranty

3

Corporation ("PBGC"), to administer an insurance system by collecting premiums from covered pension plans and paying out accrued benefits to employees in the event a pension plan has insufficient funds.  See ERISA § 4006, 29 U.S.C. § 1306; Bd. of Trs. of W. Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials, Inc., 749 F.2d 1396, 1399-1403 (9th Cir. 1984).

**B.    The MPPAA**

One type of pension plan regulated by ERISA is the multiemployer pension plan, in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers.  Plans of this sort offer important advantages to employers and employees alike.  For example, employers in certain unionized industries likely would not create their own pension plans because the frequency of companies going into and out of business, and of employees transferring among employers, make single-employer plans unfeasible.  Multiemployer plans allow companies to offer pension benefits to their employees notwithstanding these practicalities, and at the same time to share the financial costs and risks associated with the administration of pension plans.  See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust Fund for S. Cal., 508 U.S. 602, 605-07 (1993).

However,

> [a] key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage -— or force -— further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722 n.2 (1984)(quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind)) (internal quotation marks omitted).

ERISA as originally enacted did not adequately address and even exacerbated these problems. This was because of certain now-obsolete provisions, which we need not detail here, that had the effects of (1) encouraging employers to withdraw from weak multiemployer pension plans, which they often could do without compensating the plans for the inherited liabilities that remaining participants would incur; and (2) encouraging employers who did not withdraw to terminate deteriorating pension plans sooner rather than later. See Concrete Pipe, 508 U.S. at 607-08;

5

_R.A. Gray & Co._, 467 U.S. at 721; _Bd. of Trs. of W. Conference of Teamsters Pension Trust Fund_, 749 F.2d at 1402. The potential of widespread termination of pension plans caused by cascading withdrawals threatened to impose too heavy a burden on the PBGC (the insurer of protected pension benefits) and, in turn, to "collapse . . . the plan termination insurance program." _R.A. Gray & Co._, 467 U.S. at 721.

In 1980, Congress responded to this concern by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), Pub. L. No. 96-364, 94 Stat. 1208 (codified as amended in scattered sections of 26 and 29 U.S.C.). Under this amendment to ERISA, "an employer [that] withdraws from a multiemployer plan . . . is liable to the plan in the amount determined . . . to be the withdrawal liability." ERISA § 4201(a), 29 U.S.C. § 1381(a). Withdrawal liability is the withdrawing employer's proportionate share of the pension plan's unfunded vested benefits. _See R.A. Gray & Co._, 467 U.S. at 725 (citing ERISA §§ 4201, 4211, 29 U.S.C. §§ 1381, 1391). Under the MPPAA, the employer pays its withdrawal liability in annual installments, which are calculated based on the employer's historical contribution amounts. _See_ ERISA §§ 4211(c), 4219(c), 29 U.S.C. §§ 1391(c), 1399(c). The statute limits the employer's obligation to make these payments to 20 years, even if it would take more than 20 payments for the employer to pay its full withdrawal liability. _See_ ERISA

§ 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B); Nat'l Shopmen Pension Fund v. DISA Indus., Inc., 653 F.3d 573, 576 (7th Cir. 2011).

**C.    The PPA**

By 2005, a confluence of economic circumstances -- including the actual or forecasted termination of various large pension plans and the erosion of many employees' retirement savings -- again threatened ERISA's system for federally insuring multiemployer pension plans.  See Janice Kay McClendon, The Death Knell of Traditional Defined Benefit Plans: Avoiding a Race to the 401(k) Bottom, 80 Temp. L. Rev. 809, 809-12 (2007).  Thus, in 2006, Congress revisited the problems associated with underfunded pension plans by enacting the Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780 (codified as amended in scattered sections of 26 and 29 U.S.C.).  The law is far-reaching, totaling approximately one thousand pages, and introduced a number of mechanisms aimed at stabilizing pension plans and ensuring that they remain solvent.  See generally Sarah D. Burt, Note, Pension Protection? A Comparative Analysis of Pension Reform in the United States and the United Kingdom, 18 Ind. Int'l & Comp. L. Rev. 189, 199 (2008); Douglas L. Lineberry, The Pension Protection Act of 2006, S.C. Law. July 2007, at 16.

As relevant to this case, the PPA includes measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in

7

the near future.  The statute created two categories for such plans: "endangered" and "critical."  Under the PPA, a pension plan is endangered if, <u>inter alia</u>, it is less than eighty percent funded, and it is in critical status if, <u>inter alia</u>, it is less than sixty-five percent funded.  ERISA § 305(b), 29 U.S.C. § 1085(b).  If a pension plan falls into critical status, the plan sponsor must notify the participating employers and unions, ERISA § 305(b)(3)(D), 29 U.S.C. § 1085(b)(3)(D), and each participating employer must contribute an additional surcharge of five to ten percent of the contribution amount required under the applicable CBA.  <u>See</u> ERISA § 305(e)(7), 29 U.S.C. § 1085(e)(7).

Additionally, upon a multiemployer pension plan's entry into critical status, the plan's sponsor must adopt a rehabilitation plan to restore the Fund's financial health going forward:

> A rehabilitation plan is a plan which consists of --
>
> (i) actions, including options or a range of options to be proposed to the [employers and unions], formulated, based on reasonably anticipated experience and reasonable actuarial assumptions, to enable the plan to cease to be in critical status by the end of the [ten-year] rehabilitation period and may include reductions in plan expenditures (including plan mergers and consolidations), reductions in future benefit accruals or increases in contributions, if agreed to by the [employers and unions], or any combination of such actions, or
>
> (ii) if the plan sponsor determines that, based on reasonable actuarial assumptions and upon exhaustion of all reasonable measures, the plan can not reasonably be expected to emerge from critical status by the end of the rehabilitation period, reasonable measures to emerge from critical status at a later time or to forestall possible insolvency . . . .

8

ERISA § 305(e)(3)(A), 29 U.S.C. § 1085(e)(3)(A). The rehabilitation plan must set forth new schedules of reduced benefits and increased contributions, from which participating employers and unions may choose when it is time to negotiate successor CBAs. See ERISA § 305(e), 29 U.S.C. § 1085(e). One of those schedules must be designated as the "default schedule," which "assume[s] that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after [benefits] . . . have been reduced to the maximum extent permitted by law." ERISA § 305(e)(1), 29 U.S.C. § 1085(e)(1).

Most importantly for present purposes, the PPA provides as follows:

> (C) Imposition of default schedule where failure to adopt rehabilitation plan
>
> (i) In general
>
> If—
>
>> (I) a collective bargaining agreement providing for contributions under a multiemployer plan that was in effect at the time the plan entered critical status expires, and
>>
>> (II) after receiving one or more schedules from the plan sponsor [under a rehabilitation plan], the bargaining parties with respect to such agreement fail to adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule from the plan sponsor . . . ,
>>> the plan sponsor shall implement the default schedule [of the rehabilitation plan]

9

> > > beginning on the date
> > > specified in clause (ii).
>
> > (ii) Date of implementation
>
> > The date specified in this clause is the date
> > which is 180 days after the date on which the
> > collective bargaining agreement described in
> > clause (i) expires.

ERISA § 305(e)(3)(C), 29 U.S.C. § 1085(e)(3)(C).  As will be seen, it is this provision and the extent to which it bears on the facts of this case that are at the core of this appeal.

**II.  Factual Background**

The facts, which are not in dispute, are as follows:

The Fund is a multiemployer defined-benefit pension plan. The Trustees are its sponsor.

Honerkamp is a distributor of wood chips operating out of two New York facilities -- one in the Bronx and one in Central Islip.  In early 2008, Honerkamp and the Bakery Drivers Local Union No. 802 (the "Union") were parties to CBAs that covered Honerkamp's unionized employees in its two facilities.  The CBAs, which were set to expire in late 2008, obligated Honerkamp to contribute to the Fund on behalf of the company's employees.

In March 2008, the Trustees announced that the Fund was in critical status as defined by the PPA, see ERISA § 305(b)(2), 29 U.S.C. § 1085(b)(2).  They therefore began drafting a rehabilitation plan.  But they did not expect to complete the rehabilitation plan until late 2008, around the time the two

10

Honerkamp CBAs were due to expire. Because the rehabilitation plan would figure prominently in any negotiations between Honerkamp and the Union over successor CBAs, the two sides agreed to extend the existing Bronx and Central Islip agreements through February 10 and March 27, 2009, respectively.

In November 2008, the Trustees finalized the rehabilitation plan, which, as required by the PPA, set forth several new schedules of reduced benefits and increased contributions. See ERISA § 305(e), 29 U.S.C. § 1085(e). According to the rehabilitation plan, the Trustees had determined that the Fund was unlikely to emerge from critical status within the statutory ten-year rehabilitation period. See ERISA § 305(e)(4), 29 U.S.C. § 1085(e)(4). This was because the employer contribution rates required for such a result would have exceeded the amounts that employers would have had to pay to withdraw from the Fund under the MPPAA. As explained by the rehabilitation plan, the Trustees "assum[ed] that employers would be unwilling to continue to participate . . . if the cost of doing so were to exceed the cost of withdrawing." Joint Appendix ("J.A.") at 84. The Trustees therefore designed four primary, or non-default, schedules "to impose approximately the same burden actuarially on employers that a withdrawal from the [Fund] would produce." Id. at 85. Participating employers' adoption of the non-default schedules was estimated to push back the Fund's projected date of insolvency from 2021 to 2024.

11

The Trustees also included in the rehabilitation plan a default schedule, which, in accordance with the PPA, outlined the Fund's emergence from critical status. See ERISA § 305(e)(1), 29 U.S.C. § 1085(e)(1). But because the Trustees believed that the contribution levels required for the Fund to emerge from critical status were "unrealistic[ally high]," J.A. at 84, they expected the default schedule to be implemented only if a participating employer and union did not agree on one of the four non-default schedules. Presumably, this expectation was due to the earlier-excerpted portion of the PPA that requires a multiemployer pension plan in critical status to "implement the default schedule" in the event such deadlock persists for 180 days. See ERISA § 305(e)(3)(C), 29 U.S.C. § 1085(e)(3)(C).

With the rehabilitation plan finalized, Honerkamp and the Union proceeded to negotiate their successor CBAs. They considered the rehabilitation plan's schedules as well as the possibility of Honerkamp's withdrawal from the Fund. As part of that consideration, Honerkamp requested and the Trustees provided an estimate of Honerkamp's withdrawal liability under the MPPAA.

On July 22, 2009, Honerkamp sent the Union a "Last, Best, and Final Offer" for each facility. Both offers provided that, as of August 1 of that year, Honerkamp would withdraw from the Fund and create instead a 401(k) retirement plan for the company's employees. The Central Islip employees voted to ratify the offer and, together with Honerkamp, entered into a new CBA on

12

August 1 reflecting this change.  The Bronx employees initially rejected Honerkamp's offer.  With the parties then at an impasse, Honerkamp unilaterally implemented its offer -- withdrawing from the Fund in favor of the 401(k) plan -- as permitted by the National Labor Relations Act, 29 U.S.C. § 151 et seq.  The Bronx employees and Honerkamp eventually entered into a new CBA in April 2010.  Like the agreement reached with the Central Islip employees, the new Bronx CBA provided for Honerkamp's withdrawal from the Fund in favor of a 401(k) plan.

On July 31, 2009, Honerkamp informed the Trustees that it would be withdrawing from the Fund for both locations effective August 1.  The Trustees responded that the PPA required Honerkamp to contribute to the Fund under the rehabilitation plan's default schedule if the company and Union did not agree to a non-default schedule within 180 days of the CBAs' expiration.  Honerkamp countered that withdrawal was permissible and that it would be liable only to pay withdrawal liability as calculated under the MPPAA.

**III. Procedural Background**

In February 2010, the Trustees brought this suit against Honerkamp.  They argued that the PPA prevented Honerkamp from withdrawing from the Fund after the Fund entered critical status. The Trustees sought to compel Honerkamp to make retroactive and prospective contributions under the rehabilitation plan's default

13

schedule.  Honerkamp moved and the Trustees cross-moved for summary judgment.  The magistrate judge submitted to the district court a report and recommendation in favor of summary judgment for Honerkamp.  Following oral argument on the parties' motions, the district court adopted the recommendation.

The Trustees appeal from the district court's grant of summary judgment in favor of Honerkamp and denial of their cross-motion for summary judgment.

**DISCUSSION**

**I.   Standard of Review**

We review <u>de novo</u> the district court's grant of summary judgment, which relied entirely on its construction of the PPA. See <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 84 (2d Cir. 2009) ("We review <u>de novo</u> a district court's application of law to undisputed facts . . . .").

**II. The PPA's Effect on Withdrawal**

At issue here is the extent to which the PPA, in these circumstances, abrogates the ability of a participating employer to withdraw from a multiemployer pension plan in critical status. Honerkamp claims that it may withdraw from the Fund as long as it pays withdrawal liability as calculated under the MPPAA.  The Trustees do not dispute that this would have been correct before the enactment of the PPA.  But they contend that under that more recent statute, Honerkamp cannot withdraw and must continue

14

participating in the Fund while contributing in accordance with the rehabilitation plan's default schedule.  See ERISA § 305(e)(3)(C), 29 U.S.C. § 1085(e)(3)(C).

To our knowledge, no other court besides the district court in this action has considered whether the PPA prohibits employers from withdrawing from multiemployer pension plans in critical status.  On this issue, the PPA itself is silent.  But, as is always the case in issues of statutory interpretation, the "ultimate question" here "is one of congressional intent."  In re Lehman Bros. Mortg.-Backed Secs. Litig., 650 F.3d 167, 180 (2d Cir. 2011) (internal quotation marks omitted).  For the reasons that follow, we agree with the district court and Honerkamp that, in enacting the PPA, Congress did not intend to prevent employers from withdrawing from multiemployer pension plans in critical status.

"Because our task is to ascertain Congress's intent, we look first to the text and structure of the statute" as the surest guide to congressional intent.  Lindsay v. Ass'n of Prof'l Flight Attendants, 581 F.3d 47, 52 (2d Cir. 2009).  While the text of the PPA does not speak to the issue at hand directly, it does evidence Congress's understanding that employers can and will withdraw from plans in critical status.  Although there is no explicit statement of the right to withdraw, the statute appears to assume withdrawals in these circumstances by revising the calculation of withdrawal liability where the pension plan

15

withdrawn from is in critical status.  See ERISA § 305(e)(9), 29 U.S.C. § 1085(e)(9).  Specifically, the PPA provides that calculations of an employer's withdrawal liability should not take into account (1) contribution surcharges imposed automatically once a pension plan enters critical status, or (2) benefit reductions required by a rehabilitation plan.  See id.

In enacting the PPA, Congress also amended other portions of ERISA dealing with withdrawal and withdrawal liability without the slightest indication that it intended to abrogate employers' ability to withdraw from pension plans in critical status.  See PPA § 204(a)(2) (codified at ERISA § 4225(a)(2), 29 U.S.C. § 1405(a)(2)) (changing the calculation of the limitation on withdrawal liability where the employer company is sold); PPA § 204(b)(1) (codified at ERISA § 4205(b)(2), 29 U.S.C. § 1385(b)(2)) (amending the imposition of partial withdrawal liability when, inter alia, the employer's obligation to contribute to a plan ceases under some but not all CBAs or regarding some but not all facilities); see also PPA § 502(b)(codified at ERISA § 101(l)(1), 29 U.S.C. § 1021(l)(1))(redesignating and restating the requirement that the plan sponsor provide an estimate of withdrawal liability upon the employer's request).  That Congress did not hint at -- let alone explicitly state -- such an abrogation, despite clearly having withdrawal and withdrawal liability on its mind, is

16

significant. This is so in part because, in at least one other clause of the PPA, Congress unambiguously disclaimed an older portion of ERISA that it wished no longer to apply in the context of critical-status pension plans. See PPA § 202(a) (codified at ERISA § 305(e)(8)(A)(i), 29 U.S.C. § 1085(e)(8)(A)(i)) (allowing the retroactive cutting of certain benefits that typically would be prohibited).

The Trustees respond that Congress, in considering withdrawal and withdrawal liability when enacting the PPA, had in mind only "involuntary withdrawals" from plans, such as those caused by an employer's going out of business or a pension plan's liquidation. But this interpretation is unpersuasive. Nowhere in the PPA's repeated references to withdrawal did Congress suggest any voluntary/involuntary distinction, notwithstanding the decades-long precedent of employers "voluntarily" withdrawing from pension plans when financially expedient.

Our conclusion that Congress did not intend the PPA to foreclose withdrawal in these circumstances finds further support external to the statute's text. The PBGC, the agency charged with administering the withdrawal-liability provisions under ERISA, is traditionally afforded substantial deference in its reasonable interpretations of the statute. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 647-48 (1990); Kinek v. Paramount Commc'ns, Inc., 22 F.3d 503, 511 n.5 (2d Cir. 1994); see also Cent. States Se. & Sw. Areas Pension Fund v. O'Neill

17

Bros. Transfer & Storage Co., 620 F.3d 766, 774 (7th Cir. 2010);. In its interpretation of the PPA, the PBGC has adopted regulations for calculating employer liability for withdrawal from plans in critical status. See 73 Fed. Reg. 79628-02, 79632-33 (Dec. 30, 2008)(section titled "Withdrawal Liability Computations for Plans in Critical Status--Employer Surcharges") (explaining 29 C.F.R. § 4211.4). Like the PPA itself, these regulations say nothing about mandatory contributions under rehabilitation plans or prohibiting withdrawals. Nor do they suggest a distinction between voluntary and involuntary withdrawals. To be sure, the PBGC does not appear to have issued an interpretation on the precise question at issue -- whether the PPA forecloses withdrawal in these circumstances -- to which we might defer if we found Congress's intent unclear. But from every indication, the PBGC's understanding of the PPA accords with our reading of Congress's intent in enacting the law.

It is noteworthy that the Trustees themselves, before bringing this lawsuit, believed that participating employers like Honerkamp had the option of withdrawing from the Fund after it had entered critical status. The rehabilitation plan stated that its goals would "be met if," inter alia, "withdrawal liability is imposed and collected with respect to employers that withdraw from the [Fund]." J.A. at 83. Moreover, the Trustees contemplated the possibility of "voluntary" withdrawals. The rehabilitation plan explained that it did not contain only the

18

high-contribution schedules necessary for the Fund to emerge from critical status because such contribution rates "would undoubtedly drive employers to withdraw from the [Fund]," given the Trustees' "reasonable assumption that employers would be unwilling to continue to participate in the [Fund] if the cost of doing so were to exceed the cost of withdrawing." Id. Of course, the ultimate question of statutory interpretation is for the Court and not the Trustees. But we are reassured by the plaintiffs' own expressed understanding that voluntary withdrawal was permissible notwithstanding the operation of the PPA's mechanism for dealing with pension plans in critical status.

Finally, to pursue the PPA's aims, it was not necessary for Congress to forbid withdrawal, accompanied by MPPAA liability, from pension plans in critical status. Both statutes aim to protect beneficiaries of multiemployer pension plans by keeping such plans adequately funded. Indeed, the Trustees designed the rehabilitation plan's non-default schedules "to impose approximately the same burden actuarially on employers that withdrawal from the [Fund] would [have] produce[d]." Id. at 85. Consequently, Honerkamp's withdrawal from the Fund while paying liability under the MPPAA largely comports with the goals of the PPA. It is true, as the Trustees point out, that the MPPAA caps withdrawal liability such that in some cases the amount paid by withdrawing employers may not fully refund a pension plan. See ERISA § 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B) (withdrawn

19

employers are liable only for twenty years of withdrawal-liability payments).  But implementation of a rehabilitation plan under the PPA may not restore a pension plan's solvency either.  Indeed, the Trustees here determined that the Fund was unlikely to emerge from critical status, and therefore designed the non-default schedules not to prevent but only to delay the point of insolvency.  In any case, it remains true that the MPPAA and PPA pursue the same basic ends, broadly conceived.

Against the weight of these considerations, the Trustees offer very little in support of their proposed interpretation of the PPA.  For example, in arguing that Congress sought to foreclose withdrawal in circumstances of the sort presented in this case, the Trustees rely largely on a 2008 amendment to the PPA.  See Worker, Retiree, and Employer Recovery Act of 2008, Pub. L. 110-458 § 102, 122 Stat. 5092, 5100 (2008) (codified at ERISA § 305(e)(3)(C)(ii), 29 U.S.C. § 1085(e)(3)(C)(ii)).  The relevant subsection previously stated that the default schedule should be implemented at the earlier of a bargaining impasse between an employer and union or 180 days after expiration of the operative CBA.  In 2008, Congress eliminated the former date, so the default schedule now goes into effect 180 days after the pertinent CBA expires.  The Trustees argue that Congress enacted this amendment to close a loophole through which employers, via impasse and withdrawal, could escape contributing under rehabilitation plans.  However, if Congress had been trying to

20

eliminate the withdrawal option, one would think that it would have done so explicitly -- not cryptically through a timing amendment.  Moreover, the Trustees' argument would prohibit only a voluntary withdrawal upon impasse, and would not prohibit a voluntary withdrawal agreed to by an employer and union (as happened here with respect to the Central Islip employees).

## CONCLUSION

Because we agree with the district court's conclusion that the PPA does not forbid Honerkamp's withdrawal from the Fund, we AFFIRM the judgment of the district court.

21