24-1431 (L)
*Mar-Can Transp. Co. v. Loc. 854 Pension Fund*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2024

(Argued: June 11, 2025    Decided: February 18, 2026)

Docket Nos. 24-1431(L), 24-1512 (XAP)

MAR-CAN TRANSPORTATION COMPANY, INC.,

*Plaintiff-Counter-Defendant-Appellee,*

−v.−

LOCAL 854 PENSION FUND,

*Defendant-Counter-Claimant-Appellant,*

DEMOS P. DEMOPOULOS, STEPHEN MALONEY, MICHAEL SPINELLI,

*Intervenors.*

B e f o r e :

LOHIER, CARNEY, and PÉREZ, *Circuit Judges.*

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Seibel, *J.*) granting summary judgment for Plaintiff-Appellee Mar-Can Transportation Company ("Mar-Can"), and directing Defendant-Appellant Local 854 Pension Fund to reduce by $1.8 million the "withdrawal liability" it

had assessed against Mar-Can under the Employment Retirement Income Security Act of 1974 ("ERISA"). To resolve this appeal, we must interpret an ERISA provision—29 U.S.C. § 1415(c)—that has created a split between two district courts in our Circuit. The question before us is: when an employer must withdraw from a multiemployer defined benefit plan because its employees have switched labor unions, what does the employer owe its former plan under Section 1415?

In 2020, Mar-Can's employees voted for new union representation. The union vote forced Mar-Can to withdraw from the multiemployer pension plan affiliated with the employees' old union, the Local 854 Pension Fund (the "Old Plan"), and to begin contributing to a plan affiliated with the employees' new union (the "New Plan").

With Mar-Can's withdrawal, several ERISA provisions were triggered. To start, ERISA required Mar-Can to pay a statutorily defined sum, known as "withdrawal liability," to the Old Plan. Further, it directed the Old Plan to transfer to the New Plan certain assets and liabilities associated with the 144 active Mar-Can employees who were switching unions. Finally, it mandated that the Old Plan reduce Mar-Can's withdrawal liability to account for the assets and liabilities transferred from the Old Plan to the New. Under Section 1415(c), the designated reduction was the amount by which the "value of the unfunded vested benefits" transferred exceeded the "value of the assets transferred."

This appeal arises from Mar-Can's and the Old Plan's divergent interpretations of the phrase "unfunded vested benefits" as used in Section 1415(c). Mar-Can's reading, which the District Court endorsed, would lead to a $1.8 million reduction in Mar-Can's withdrawal liability. The Old Plan's approach, in contrast, would lead to no reduction at all.

Reviewing *de novo* the District Court's interpretation of the statute, we decide that the phrase "unfunded vested benefits" as used in Section 1415(c) is ambiguous. Looking then to the statute's structure and purpose, we conclude that the District Court in this case correctly interpreted Section 1415(c). Accordingly, Mar-Can was entitled to a $1.8 million reduction in its withdrawal liability. The judgment of the District Court is affirmed, and Mar-Can's cross-appeal of an evidentiary ruling is dismissed as moot.

AFFIRMED.

––––––––––

JENNIFER S. SMITH, The Law Offices of Jennifer Smith, PLLC, New York, NY, *for Plaintiff-Counter-Defendant-Appellee.*

2

DANIEL TREIMAN (Anusha Rasalingam and Eugene S. Friedman *on the brief*), Friedman & Anspach, New York, NY, *for Defendant-Counter-Claimant-Appellant*.

———————

CARNEY, *Circuit Judge*:

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Seibel, *J.*) granting summary judgment for Plaintiff-Appellee Mar-Can Transportation Company ("Mar-Can"), and directing Defendant-Appellant Local 854 Pension Fund to reduce by $1.8 million the "withdrawal liability" it had assessed against Mar-Can under the Employment Retirement Income Security Act of 1974 ("ERISA"). To resolve this appeal, we must interpret an ERISA provision—29 U.S.C. § 1415[1]—that has created a split between two district courts in our Circuit. The question before us is: when an employer withdraws from a multiemployer defined benefit plan because its employees have switched labor unions, what does the employer owe its former plan under Section 1415?

In 2020, Mar-Can's employees voted to leave Teamsters Local 553 and become members of the Amalgamated Transit Workers (the "ATW"). The union vote forced Mar-Can to withdraw from the Teamsters-affiliated Local 854 Pension Fund (the "Old Plan"), and to begin contributing to an ATW-affiliated multiemployer pension plan (the "New Plan").

With Mar-Can's withdrawal, several ERISA provisions were triggered. To start, ERISA required Mar-Can to pay a statutorily defined sum, known as "withdrawal liability," to the Old Plan. *See* 29 U.S.C. § 1381. This sum was intended by Congress to preserve the financial viability of a multiemployer plan faced with a departing

————————————

[1] For simplicity, in this opinion we will refer to the relevant provisions of ERISA only as codified in title 29 of the U.S. Code.

employer and the attendant loss of the employer's future contributions. Further, ERISA directed the Old Plan to transfer to the New Plan certain assets and liabilities associated with the 144 active Mar-Can employees who were switching unions. *See id.* § 1415(a), (b)(2)(A)(ii), (g)(1). Finally, ERISA mandated that the Old Plan reduce Mar-Can's withdrawal liability to account for the assets and liabilities transferred from the Old Plan to the New. Under Section 1415(c), the designated reduction was the amount by which the "value of the unfunded vested benefits" transferred exceeded the "value of the assets transferred."

This appeal arises from Mar-Can's and the Old Plan's divergent interpretations of Section 1415(c) and of the phrase "unfunded vested benefits" as used therein. Mar-Can argues, and the District Court agreed, that the Old Plan should have reduced Mar-Can's withdrawal liability by roughly $1.8 million, an amount that would reflect the difference between the $5.5 million in Mar-Can-related liabilities and $3.7 million in Mar-Can-related assets that were transferred from the Old Plan to the New. Its rationale is that, by offloading more liabilities than assets, the Old Plan effectively collected the withdrawal liability that Mar-Can owed. In contrast, the Old Plan proposes an interpretation of Section 1415(c) that would lead to no reduction at all in the assessed withdrawal liability. The Old Plan's approach was earlier endorsed by a thoughtful district court decision in our Circuit, *Hoeffner v. D'Amato*, No. 09-CV-316, 2016 WL 8711082 (E.D.N.Y. 2016)—a decision that was not subject to this Court's review.

Evaluating *de novo* the District Court's interpretation of the statute, *Kasiotis v. N.Y. Black Car Operators' Inj. Comp. Fund, Inc.*, 90 F.4th 95, 98 (2d Cir. 2024), we decide that the phrase "unfunded vested benefits" as used in Section 1415(c) is ambiguous. Looking then to the statute's structure and purposes, we conclude that the District Court in this case correctly interpreted Section 1415(c). Mar-Can is therefore entitled to

4

a $1.8 million reduction in its withdrawal liability. The judgment of the District Court is affirmed, and Mar-Can's cross-appeal of an evidentiary ruling is dismissed as moot.

## I.     Statutory background

The parties' dispute centers on certain provisions of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which amended ERISA six years after its enactment in 1974. As its name implies, the MPPAA created statutory provisions, including Section 1415, that are specific to multiemployer pension plans and the unique challenges they present.

### A.     Multiemployer pension plans

In a multiemployer pension plan, participating employers make regular contributions into a common fund that is regulated by ERISA. *See* 29 U.S.C. §§ 1002(37), 1301(a)(3). Each employer's collective bargaining agreement with its workers' union designates the plan to which the employer will contribute and sets out the terms of those contributions. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605 (1993) ("*Concrete Pipe*"). The multiemployer plan will also have an entity that serves as "plan sponsor"—often a nonprofit association or board of trustees. *See* 29 U.S.C. § 1002(16)(B)(iii). The plan sponsor is charged with ensuring the financial health of the plan, including by notifying employers if the plan is substantially underfunded.[2] *See Trs. of Loc. 138 Pension Tr. Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2d Cir. 2012) ("*Honerkamp*").

---

[2] A plan's operating instrument may also establish a plan "administrator" that is charged with administering the fund. *See* 29 U.S.C. § 1002(16)(A). If no separate administrator is designated by the terms of the plan's operating instrument, then by default the plan sponsor serves in this role. *Id.*

A multiemployer pension plan does not apportion the contributions it receives into employer-specific accounts; rather, it holds them in a general fund. *See Concrete Pipe*, 508 U.S. at 605. The consolidated funds are available to pay benefits owed to employees of any participating employer. *Id.* at 605–06; *see also Ganton Techs., Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 464 (2d Cir. 1996). This pooling approach means that an employee's pension does not derive from only an employee's own and an employer's accumulated contributions, even if that employee has stayed with the same employer during his whole working life. The collective contributions should—at least in theory—enable the plan to fulfill its obligations to all participating employees over many years. *See Honerkamp*, 692 F.3d at 129.

In industries such as the construction industry, where employees frequently change employers while remaining a member of a single union, employees may find multiemployer plans particularly useful. *See Concrete Pipe*, 508 U.S. at 605–06. Unlike in traditional single-employer plans (which ERISA originally focused on), employees in a multiemployer plan (which the MPPAA addressed) receive service credits toward their pension entitlement while working for any participating employer. *Id.* Generally speaking, after accumulating a designated amount of service with participating employers, an employee's right to obtain benefits from the multiemployer plan will vest and become nonforfeitable. *Id.* at 606.

B.      Reasons for the MPPAA

When Congress enacted ERISA in 1974, one of its principal goals was to protect employees from the risk that a benefit plan would be terminated "before sufficient funds ha[d] been accumulated" to cover the pensions it was meant to pay out. *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) ("*Gray*"). To that end, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned government entity that "guarantees the payment of benefits to plan participants and

6

beneficiaries, paying the plan's obligations if the plan terminates with insufficient assets to support its guaranteed benefits." *T.I.M.E.-DC, Inc. v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985).

Use of single and multiemployer pension plans skyrocketed during the mid-twentieth century.[3] By the 1970s, Congress had become concerned that multiemployer plans might undergo a "vicious downward spiral" of underfunding that would lead to their dissolution and imperil the PBGC's ability to guarantee the promised benefits. *Gray*, 467 U.S. at 722 n.2 (internal quotation marks and citation omitted). When an employer withdrew from a plan after its employee's benefits had vested, the plan was often still required to pay those employees' benefits. *T.I.M.E.-DC, Inc.*, 756 F.2d at 946. Legislators therefore feared that employers would withdraw after their employees' benefits had vested but before satisfying their funding obligations, leaving a plan overloaded with unfunded liabilities. *Id.* at 943. Remaining employers would face a difficult choice: either withdraw from the teetering plan themselves, further risking the health of the plan, or stay and assume responsibility for another employer's left-behind pensioners. *Id.*; *see also Gray*, 467 U.S. at 722 n.2.

Under the law before the MPPAA, an employer that was up to date on its required contributions could withdraw from a plan and incur no responsibility for the

---

[3] For an overview of this history and the explosion in liabilities that the PBGC became responsible for insuring, *see* J. Robert Suffoletta, Jr., *Who Should Pay When Federally Insured Pension Funds Go Broke?: A Strategy for Recovering from the Wrongdoers*, 65 Notre Dame L. Rev. 308, 311–14 (1990). The House Education and Labor Pension Committee Report on the MPPAA also summarizes this history. *See* H.R. Rep. No. 96-869, pt. 1, at 54 (1980) ("The financial instability of some multiemployer plans was not an identifiable problem prior to the passage of ERISA, because participation in such plans and the industries they covered generally continued to grow in the [30 years] before passage . . . . In recent years, however, external economic factors . . . resulted in a significant decline in the number of contributors or the number of active employees in the contribution base . . . .").

plan's then-unfunded liabilities, so long as the plan did not terminate within five years after the employer's departure. *See T.I.M.E.-DC, Inc.*, 756 F.2d at 943–44. This rule incentivized withdrawal at the first sign of trouble, however. *See Honerkamp*, 692 F.3d at 129. By exiting the plan, the employer could escape responsibility to employees whose benefits had vested and avoid paying off the mountain of liabilities that accrued after other employers fled the troubled fund. *Id.* at 129–30.

### C.    Withdrawal liability

One of the MPPAA's key reforms was that it obligated a company withdrawing from a multiemployer plan to pay "withdrawal liability." 29 U.S.C. § 1381; *see also Honerkamp*, 692 F.3d at 130. The term "withdrawal liability" refers to "an employer's obligation . . . to fund the old plan to the extent that that plan remains responsible [for providing benefits to the withdrawing employer's] employees upon their retirement." *T.I.M.E.-DC, Inc.*, 756 F.2d at 946. The withdrawal-liability system is intended to discourage employers from fleeing troubled multiemployer plans. *See* H.R. Rep. No. 96-869, pt. 1, at 67 (1980); 29 U.S.C. § 1001a(c)(2); *The Multiemployer Pension Plan Amendments Act of 1979: Hearings on H.R. 3904 Before the Subcomm. on Lab.-Mgmt. Rels. of the H. Comm. on Educ. & Lab.*, 96th Cong. 362 (1979) (statement of Ray Marshall, Secretary of Labor).

The MPPAA provisions governing withdrawal liability are codified in Part 1 of Subtitle E of ERISA. *See* 29 U.S.C. §§ 1381–1405. To calculate withdrawal liability, the old plan's sponsor must determine the total liabilities of the communal pool, whether or not they are attributable to the withdrawing employer's own employees. *Barbizon Corp. v. ILGWU Nat'l Ret. Fund*, 842 F.2d 627, 629 (2d Cir. 1988). The plan's liabilities are the "value of nonforfeitable benefits under the plan," 29 U.S.C. § 1393(c)(A), that is, the present value of all benefits for which a participant has satisfied the eligibility requirements, other than submission of a formal application, a waiting period,

8

retirement, or death, *id.* § 1301(a)(8). The portions of ERISA at issue in this appeal also refer to these "nonforfeitable benefits" as "vested benefits" or "liabilities." *See, e.g., id.* §§ 1393(c), 1415. In our discussion below, therefore, we use these three terms interchangeably.[4]

Next, the plan sponsor determines the extent to which these vested benefits were "unfunded" in a specified period (or periods) of time. In Part 1 of ERISA's Subtitle E, the statute defines "unfunded vested benefits" as "(A) the value of [vested] benefits under the plan, less (B) the value of the assets of the plan." *Id.* § 1393(c). That is, in this context, vested benefits are "unfunded" when they are not offset by assets in the communal pot.

Then, the plan sponsor estimates the withdrawing employer's share of these "unfunded vested benefits" according to one of four methods permitted by law. *See id.* § 1391(b)–(c); 29 C.F.R. § 4211.1(a). Here, the plan sponsor used ERISA's "presumptive method," which determines the employer's share based on the amount the employer has contributed to the plan over a specified period in relation to the total contributions made by all employers over that period.[5] *See Concrete Pipe*, 508 U.S. at 610; 29 U.S.C.

---

[4] In interpreting ERISA, "nonforfeitable" benefits may not always be the same as "vested" benefits. *See Hoeffner*, 2016 WL 8711082, at *8 n.15 (citing PBGC Opinion Letter that differentiates between the two types of benefits). But the ERISA provision at issue here, Section 1415, refers to "nonforfeitable benefits," "vested benefits," and "liabilities," without appearing to distinguish between the three. *See, e.g.*, 29 U.S.C. § 1415(a), (b)(2)(A)(ii)–(iii), (c)(1), (e)(2)(A), (g)(1). And in this case, both parties treat the terms as interchangeable, at least as applied to Mar-Can.

[5] As relevant here, the presumptive approach directs the plan sponsor to calculate, for each year after the MPPAA's enactment, the amount by which the plan's overall unfunded vested benefits increased or decreased. *See id.* § 1391(b)(1), (2). The plan sponsor then determines the employer's share of the increase in unfunded vested benefits by calculating the "proportion of total employer contributions to the plan made by the withdrawing employer" during the five-year period prior to the employer's withdrawal. *Concrete Pipe*, 508 U.S. at 610.

§ 1391(b)(2)(E)(ii), (b)(3)(B), (b)(4)(D)(ii). The resulting estimate of the employer's share, subject to certain statutorily required adjustments, *see* 29 U.S.C. § 1381(b)(1), is that employer's withdrawal liability.[6]

If the plan sponsor determines that the employer owes withdrawal liability, it must notify the employer of the amount owed and provide a payment schedule, which is again determined based on a statutory standard. *See id.* § 1399(b)(1)(A), (c). No later than 60 days after receiving that notice, the employer must begin making payments. *Id.* § 1399(c)(2). It will continue making regular payments towards its withdrawal liability for up to twenty years, *id.* § 1399(c)(1)(B); it can also elect to pay off the withdrawal liability more quickly, *id.* § 1399(c)(4).

---

ERISA describes three methods in addition to the presumptive approach. Two are also "pro rata" calculations that are based on the employer's share of contributions over a given period. *See* 29 U.S.C. § 1391(c)(2), (c)(3). A third, the "direct attribution method," links the amount the employer must pay to the "unfunded vested benefits which are attributable to participants' service with the employer." *See id.* § 1391(c)(4). Even under the direct attribution method, however, a share of the liabilities unattributable to any particular employer in the plan is allocated to the departing employer. *See id.* § 1391(c)(4)(A)(ii).

[6] Thus, Section 1381(b)(1) provides as follows:

> The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted—
>
> > (A) first, by any de minimis reduction applicable under section 1389 of this title,
> >
> > (B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,
> >
> > (C) then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and
> >
> > (D) finally, in accordance with section 1405 of this title.

Withdrawal liability plays an important role in the multiemployer plan system, because it helps to prevent employer exits from a troubled fund. It also helps, of course, to ensure that a departing employer pays its fair share of the liabilities borne by the old plan, protecting the workers who are entitled to collect their pensions from the old plan's communal pot. *See also T.I.M.E.-DC, Inc.*, 756 F.2d at 944; *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 880–81 (2d Cir. 1988).

D.    <u>Reductions to withdrawal liability in the ordinary case, including upon an employer's voluntary withdrawal from a plan</u>

In most withdrawal scenarios, including where an employer voluntarily exits a plan, the employer can seek a reduction in the amount of withdrawal liability calculated by the plan's sponsor. As relevant here, the employer is entitled to a reduction if its old plan transfers to its new plan certain liabilities related to the employer. *See* 29 U.S.C. § 1391(e). For example, when current employees switch plans, the employer may prefer that they collect all of their benefits from the new plan, including those benefits that vested while they were participating in the old plan. *See, e.g., Ganton Techs., Inc.*, 76 F.3d at 464. It may therefore ask the old plan to transfer those liabilities to the new plan.

An old plan generally has discretion to approve or reject an employer's transfer request. *See id.* at 466. In approving or denying the request, however, the old plan must comply with ERISA's asset transfer rules, including that it cannot "unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities." *See* 29 U.S.C. § 1414(a). If the old plan approves the transfer, ERISA provides for a corresponding reduction to an employer's withdrawal liability: Section 1391(e) directs the old plan to subtract the value of any "transferred unfunded vested benefits" from the employer's withdrawal liability. Recall that in Part 1 of ERISA's Subtitle E, "unfunded vested benefits" is defined as liabilities (*i.e.*, vested benefits) minus assets. *See id.* § 1393(c). Thus, in this context, the "transferred unfunded vested benefits" are the

11

total liabilities that were transferred from the old plan to the new one, minus any assets that were transferred.

If the departing employer brings with it liabilities that equal or exceed its withdrawal liability, and no assets, the Section 1391(e) reduction means that the employer will owe no withdrawal liability to the old plan. The goals of the MPPAA are therefore satisfied: the old plan is compensated for the employer's withdrawal, because it is able to offload liabilities that equal or exceed the employer's withdrawal liability. Financially, the old plan is in the same position as if the employer had paid its withdrawal liability. The employer, for its part, begins to pay into the new plan, and makes no further payments to the old plan.

Because the term "unfunded vested benefits" is defined for the purposes of Part 1, Section 1391(e) is not difficult to interpret. But the reduction contemplated by Section 1391(e) does not apply when, as happened to Mar-Can, an employer withdraws from a multiemployer plan because of a change in bargaining representative. We turn now to the special provisions that apply in such a case.

E.    Reduction to withdrawal liability when plan transfer is required by a certified change of collective bargaining representative

Section 1415, in Part 2 of ERISA's Subtitle E, governs when an employer "has completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change of collective bargaining representative . . . ." 29 U.S.C. § 1415(a). In the event of such a withdrawal, it provides that "the old plan *shall* transfer assets and liabilities to the new plan" in the fashion that the law directs. *Id.* § 1415(a) (emphasis added). Unlike when an employer voluntarily withdraws from a plan, therefore, the old plan does not have discretion to choose the amount of assets or liabilities it will transfer. It must transfer to the new plan the liabilities (*i.e.*, vested benefits) associated with all of

12

its active employees who are switching unions. *See id.* § 1415(b)(2)(A)(ii); PBGC,

Opinion Letter 88-6 (Apr. 1, 1988), 1988 WL 192427, at *1.

If the transferred liabilities exceed the total amount the employer owes in withdrawal liability, the old plan must also transfer assets to the new plan to make up the difference. *See* 29 U.S.C. § 1415(b)(3), (g)(1). This too is a difference from the ordinary case, in which the old plan is not required to transfer any particular amount of assets. *See Ganton Techs., Inc.*, 76 F.3d at 466. Meanwhile, the exiting employer's former workers remain with the old plan and continue to receive benefits from its coffers based on the employer's past contributions. *See T.I.M.E.-DC, Inc.*, 756 F.2d at 946.

After a change in bargaining representative, the withdrawal process proceeds in several steps. To begin, the old plan notifies the exiting employer of its withdrawal liability amount, which the plan sponsor must calculate in the same manner as is described above for the general case of withdrawal. 29 U.S.C. § 1415(b)(2)(A)(i). Next, it confirms to the departing employer the plan's "intent to transfer to the new plan" responsibility for paying out the vested benefits of active employees who are switching plans. *Id.* § 1415(b)(2)(A)(ii). Further, it notifies the employer of the total "amount of assets and liabilities [it will] transfer[] to the new plan . . . ." *Id.* § 1415(b)(2)(A)(iii).

After those notifications, a transfer will occur in one of two possible ways. In the first, absent objection and appeal,[7] the "plan sponsor of the old plan shall transfer the appropriate amount of assets and liabilities to the new plan." *Id.* § 1415(b)(3). In the second, the sponsors of the old and new plans can agree that a different amount of assets or liabilities should be transferred. *See Walter v. Int'l Ass'n of Machinists Pension*

---

[7] The employer might object, for example, to the old plan's calculation of its withdrawal liability.

*Fund*, 949 F.2d 310, 314 (10th Cir. 1991) (describing possibility of agreement between old plan and new plan).[8]

Regardless of the transfer method chosen, however, the departing employer's withdrawal liability will be reduced as described in Section 1415(c), which provides as follows:

> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which—
>
> (1) *the value of the unfunded vested benefits allocable to the employer which were transferred* by the plan sponsor of the old plan to the new plan, exceeds
>
> (2) the value of the assets transferred.

29 U.S.C. § 1415(c) (emphasis added). As previewed, the parties disagree about how the old plan should calculate "the value of the unfunded vested benefits allocable to the employer" referred to in Section 1415(c)(1).

---

[8] By default, Section 1415 sets the amount of assets and liabilities that must be transferred from the old plan to the new. But the joint operation of Sections 1415(f)(1), 1411, and 1414 allows the old plan and the new plan to negotiate other arrangements. If both wish to leave some quantum of assets or liabilities behind, rather than the amount that is dictated by statute, these provisions give them the discretion to come to some alternative arrangement. They remain subject, however, to their ordinary fiduciary obligations, as well as to the other transfer requirements set out in Sections 1411 and 1414, such as Section 1411(b)(2)'s requirement that "no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the . . . transfer than the benefit immediately before that date . . . ."

## II. Factual background

In this appeal, the facts are largely undisputed. We draw them primarily from the parties' respective statements of undisputed material facts, submitted at summary judgment.

Plaintiff-Appellee Mar-Can is a school bus company that primarily transports special-needs children in Westchester and New York Counties, in New York State. In 1979, Mar-Can entered into a collective bargaining agreement ("CBA") with a Teamsters local union chosen by its bus driver employees and began contributing to the associated Old Plan on their behalf. The Old Plan is a multiemployer defined benefit plan that, at the time of the events described here, had long supported the pension benefits of employees and former employees of Mar-Can and other participating companies.

In March 2020, Mar-Can's employees voted to leave the Teamsters local and join an ATW local. The National Labor Relations Board certified the election results, thus automatically terminating Mar-Can's CBA with the Teamsters local and triggering Mar-Can's obligation to negotiate a new CBA and to contribute to the New Plan, which is affiliated with the ATW local.[9] In April 2020, declaring that Mar-Can had effected a "complete withdrawal" under 29 U.S.C. § 1383, the Old Plan assessed Mar-Can approximately $1.8 million in withdrawal liability. ERISA obligated Mar-Can to begin

---

[9] Mar-Can asked the Old Plan to allow it to sign onto a participation agreement that would allow Mar-Can to continue contributing to the Old Plan, but the Old Plan's trustees rejected the proposal.

paying this sum within 60 days of the sponsor's demand to the Old Plan, concurrent with making its regular contributions to the New Plan.[10] *See* 29 U.S.C. § 1399(c)(2).

Mar-Can objected that the Old Plan had not transferred the assets and liabilities associated with its active employees to the New Plan, as required by Section 1415(a). It further asserted that Section 1415(c) directed the Old Plan to reduce Mar-Can's withdrawal liability to reflect the Old Plan's transfer of liabilities upon the departure from the Old Plan of Mar-Can's active employees.[11] The Old Plan rejected both transfer and reduction requests. And meanwhile, Mar-Can began making regular contributions to the New Plan, as required by its CBA with the ATW local.[12]

## III.    Procedural history

In October 2020, after unsuccessfully seeking to arbitrate the withdrawal liability dispute, Mar-Can sued the Old Plan, seeking an order that would (1) require the Old Plan to transfer certain assets and liabilities to the New Plan, and (2) reduce Mar-Can's

---

[10] The statute imposes a pay-now, ask-questions-later regime in withdrawal cases, to protect the plan being left behind. *See* 29 U.S.C. § 1399(c)(2). An employer is still entitled, however, to question the former plan's calculation of withdrawal liability and to initiate arbitration as to its withdrawal liability in cases where relevant facts are contested. *See id.* §§ 1399(b)(2)(A), 1401.

[11] Initially, Mar-Can's call for a reduction of withdrawal liability cited another section in ERISA, 29 U.S.C. § 1391(e). But since the dispute came to a head, the company's position has rested on Section 1415(c).

[12] As these proceedings were unfolding, two other local companies experienced similar disruptions when their employees—also Teamsters members until then—voted to follow Mar-Can employees to the same ATW local and hence to the New Plan. The Old Plan similarly rejected those companies' claims to the reduced withdrawal liability calculation urged by the Mar-Can here, and the resulting lawsuits were assigned to Judge Seibel, who decided them based on her analysis in this case. *See Jofaz Transp., Inc. v. Loc. 854 Pension Fund*, No. 22-CV-3455, 2024 WL 3887225, at *2 (S.D.N.Y. Aug. 21, 2024); *Allied Transit Corp. v. Loc. 854 Pension Fund*, No. 21-CV-10556, 2024 WL 3887245, at *1 (S.D.N.Y. Aug. 21, 2024). Appeals in those cases are being held pending resolution of this appeal. *See* U.S. Court of Appeals for the Second Circuit No. 24-2597 (*Jofaz*); No. 24-2593 (*Allied*).

16

withdrawal liability assessment in the amount it said Section 1415(c) required. On January 14, 2021, Mar-Can amended its complaint to reassert and refine the same claims.

In May 2021, the Old Plan notified Mar-Can that it would transfer liabilities valued at $5,479,926 (for convenience, "$5.5 million") and assets valued at $3,680,318 ("$3.7 million") to the New Plan to cover 144 of Mar-Can's active employees, who had all moved to the New Plan.[13] Meanwhile, 65 former Mar-Can employees (retired or deferred-vested employees) remained as participants in the Old Plan.

Despite its May 2021 notice, the Old Plan did not make the promised transfers of assets and liabilities for over a year, until after the District Court directed it to do so in May 2022.[14] With the transfer finally effected, the New Plan assumed all of the liabilities attributable to the active employees of Mar-Can and accepted the transfer of the designated related assets. Nevertheless, the Old Plan insisted that Mar-Can still owed it $1.8 million. This was the amount that, the Old Plan had determined, was Mar-Can's share of the fund's unfunded liabilities. But because of the Section 1415 transfer, Mar-Can had already relieved the Old Plan of outstanding obligations exactly equal to that

---

[13] The Old Plan initially notified Mar-Can that it would transfer liabilities and assets to cover 142 employees. In January 2023, the Old Plan additionally transferred pension liabilities of $413,343 and assets of the same amount to the New Plan to cover two Mar-Can employees who had been omitted from the initial transfer group of 142. The additional transfers of assets and liabilities did not change the Old Plan's overall withdrawal liability calculation for Mar-Can.

[14] The Old Plan purports to appeal also from the portion of the District Court's judgment ordering it to transfer assets and liabilities to the New Plan as required by Section 1415. However, it advances no argument in its briefs that this transfer order was unwarranted. We therefore treat this point as abandoned. *See Ahmed v. Holder*, 624 F.3d 150, 153 (2d Cir. 2010) ("Issues not briefed on appeal are considered abandoned.").

share: the difference between the $5.5 million in liabilities and the $3.7 million in assets that were shifted to the New Plan.[15]

The Old Plan continued to demand $1.8 million as its due, regardless of the now-removed liabilities. And in March 2023, the parties cross-moved for summary judgment, each proposing its preferred interpretation of Section 1415(c)'s provision regarding reduction of withdrawal liability after transfer of assets and liabilities.[16]

In March 2024, the District Court awarded partial summary judgment to Mar-Can, adopting Mar-Can's position that, after the asset and liability transfer to the New Plan, Section 1415(c) directed the reduction of Mar-Can's withdrawal liability to zero. *Mar-Can Transp. Co. v. Loc. 854 Pension Fund*, 722 F. Supp. 3d 355, 378–79 (S.D.N.Y. 2024).

The Old Plan timely appealed.[17]

### DISCUSSION

We review *de novo* a district court's grant of summary judgment, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *Beck v. Manhattan College*, 136 F.4th 19, 22

---

[15] The parties do not dispute the calculation of Mar-Can's withdrawal liability for the purposes of the summary judgment motions and, therefore, for this appeal. Here, Mar-Can's claimed reduction pursuant to Section 1415 is precisely the full amount of its withdrawal lability. The competing interpretations of Section 1415(c) at issue thus turn only on whether, under the statute, the withdrawal liability amount should be reduced in full, or not at all.

[16] They each also provided (and the District Court excluded) expert reports purporting to validate their respective interpretations of the statute.

[17] In its cross-appeal, Mar-Can challenges only the District Court's rejection of its expert report. As explained above, in light of our decision to affirm the District Court's judgment in Mar-Can's favor, we dismiss Mar-Can's cross-appeal as moot.

(2d Cir. 2025) (alterations adopted, internal quotation marks omitted). A court should grant summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As noted above, the parties do not dispute the relevant facts.

## I. The parties' competing interpretations of Section 1415

Section 1415(c) directs the plan sponsor to reduce the withdrawal liability "by the amount by which—(1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds (2) the value of the assets transferred."

This case presents a novel legal question in this and other Circuits, despite the decades that have passed since the MPPAA's enactment: to what extent should a plan reduce an employer's withdrawal liability if the employer withdrew from the plan because its employees have changed their collective bargaining representative? Or, in statutory terms, what is the correct construction of the phrase "unfunded vested benefits" as used in Section 1415(c)?

Mar-Can submits, and the District Court concluded, that the referenced "unfunded vested benefits" are the total amount of liabilities transferred by the Old Plan to the New Plan. To determine the Section 1415(c) withdrawal-liability reduction, then, one would simply take the value of the liabilities transferred (the "unfunded vested benefits," on this view), 29 U.S.C. § 1415(c)(1), and subtract the "value of the assets transferred," *id.* § 1415(c)(2). This can be represented by the following formula:

$$\text{Reduction in Withdrawal Liability} = \textbf{Liabilities Transferred} - \text{Assets Transferred}$$

For ease of comparison to the Old Plan's approach, we show Mar-Can's definition of the term "unfunded vested benefits" in bold. This is where the parties' dispute lies.

19

Applied here, Mar-Can's formula would entitle it to a $1.8 million reduction, because the liabilities transferred ($5.5 million) minus the assets transferred ($3.7 million) equals $1.8 million. Because Mar-Can's calculated withdrawal liability is also $1.8 million, that reduction would bring its withdrawal liability to zero. Mar-Can argues that this outcome is both correct and fair, because by offloading to the New Plan more liabilities than assets, the Old Plan has effectively recouped the amount of withdrawal liability that it would otherwise be entitled to collect from Mar-Can.

The Old Plan reads Section 1415(c) differently. It proposes that "unfunded vested benefits allocable to the employer" refers to those transferred liabilities that are not associated with any transferred assets: that is, an amount obtained by taking the value of the transferred liabilities less the value of the transferred assets. To determine the reduction amount, then, the Old Plan would take the liabilities transferred *less* the assets transferred (its definition of "unfunded vested benefits"), 29 U.S.C. § 1415(c)(1), and then subtract the "value of the assets transferred" *again*, *id.* § 1415(c)(2). In other words, as decoded by the Old Plan, Section 1415(c) reads: "liabilities minus assets minus assets." Or, to show the Old Plan's theory in a formula, with its definition of "unfunded vested benefits" in bold:

$$\text{Reduction in Withdrawal Liability} = \left( \mathbf{\text{Liabilities Transferred}} - \mathbf{\text{Assets Transferred}} \right) - \text{Assets Transferred}$$

$$= \text{Liabilities Transferred} - 2\left( \text{Assets Transferred} \right)$$

The Old Plan's formula leads to a very different result in this case. Taking the liabilities transferred ($5.5 million) and subtracting twice the assets transferred ($7.4 million) generates a negative number. Accordingly, Mar-Can would be entitled to no reduction of its withdrawal liability at all, which would remain at $1.8 million.

Indeed, under the Old Plan's approach, no employer would be entitled to *any* reduction in withdrawal liability under Section 1415(c) unless the liabilities its old plan transferred were more than double the assets it transferred. As the formula shows, employers would effectively pay twice for any transferred assets: *once*, because those assets would be deducted to calculate the "unfunded vested benefits" amount, *id.* § 1415(c)(1), and *again*, because the statute directs the Old Plan to deduct "the value of the assets transferred" from those unfunded vested benefits, *id.* § 1415(c)(2).

## II.    Mar-Can's reading best reflects the statute's text, structure, and legislative purpose

For the reasons set forth below, we conclude that the phrase "unfunded vested benefits allocable to the employer" is ambiguous as used in that Section. When the text of a statute is ambiguous, "we test the competing interpretations against both the statutory structure . . . and the legislative purpose and history of [the provision]." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) (internal quotation marks omitted). Here, both structure and legislative purpose confirm that Mar-Can's interpretation of Section 1415(c) is the correct one. We therefore affirm the District Court's grant of summary judgment to Mar-Can.[18]

---

[18] Mar-Can asserts that our 1985 decision in *T.I.M.E.-DC, Inc.* controls this case. That panel wrote about Section 1415:

> The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. In this way the statute reaches a proper allocation of the employer's payments on behalf of its employees. It ensures that both plans are funded and avoids the possibility of double payments by the employer.

756 F.2d at 946. Our holding today is fully consistent with that statement, certainly. But the *T.I.M.E.-DC* Court's holding was that Section 1415's transfer provisions did not alter the

A.    The phrase "unfunded vested benefits allocable to the employer" is ambiguous

We begin, as we must, with "the plain language" of the statute, "giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans, Inc.*, 810 F.3d 861, 868 (2d Cir. 2015) (internal quotation marks omitted). We interpret the language "with a view to [each term's role] in the overall statutory scheme." *See Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022) (internal quotation marks omitted).

The parties are in accord on the meaning of the term "vested benefits": "vested" means "fully and unconditionally guaranteed as a legal right, benefit, or privilege." *Vested*, Merriam-Webster Dictionary, https://perma.cc/V6CG-DJZQ (last visited Sept. 8, 2025).[19] In the context of pensions, it means that the right has become nonforfeitable as to the employee, who is eligible to collect it and entitled to enforce that right. *See* 29 U.S.C. §§ 1002(25), 1053(a); *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 320 F.3d 151, 156 (2d Cir. 2003) ("Under ERISA, . . . [v]ested benefits . . . refer to those normal retirement benefits to which an employee has a nonforfeitable claim; in other words, those accrued benefits he is entitled to keep." (internal quotation marks omitted)).

---

employer's obligation to begin paying withdrawal liability even if it believes the old plan has not transferred the appropriate amount of assets and liabilities to the new plan. *See id.* at 943, 947. The panel's statement there about the goals of the Section 1415(c) reduction was *dicta*.

[19] *See also Vested*, Black's Law Dictionary (12th ed. 2024) ("Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute . . . ."). As used in ERISA, the word comports with the standard definition of "benefits" as referring to "a payment or service provided for under an annuity, pension plan, or insurance policy." *Benefits*, Merriam-Webster, https://perma.cc/B42R-ZAAT (last visited Sept. 8, 2025).

The parties' difference hinges on the word "unfunded" as it is used to modify the "vested right" that is "allocable to the employer" in Section 1415(c). We therefore examine Section 1415's use of that modifier.

Mar-Can urges that liabilities can be termed "unfunded" simply because they represent an amount owed to vested employees, and the employer's obligation to pay the vested benefits is outstanding. Thus, those liabilities remain "unfunded" because they are still unpaid, even when transferred alongside assets. The assets, although transferred at generally the same time as the liabilities, have no indelible link to those liabilities; they could be used, for example, to pay other obligations of the New Plan.

To support this reading, Mar-Can points out that Section 1415(c)—with its distinct subsections (1) and (2)—appears to track two distinct variables. As a student's math worksheet might present a subtraction problem, the statute directs the reader to take one number (the "unfunded vested benefits" transferred) and subtract another number (the "assets" transferred). This formulation suggests that the variables are independent: the "unfunded vested benefits" are unpaid liabilities, and the "assets" are undesignated funds. This is one plausible reading of the statute.

The Old Plan, on the other hand, submits that the transferred vested benefits are "unfunded" if they are not "offset . . . by transferred assets." Appellant's Br. at 29. This interpretation would have us focus on the asset and liability transfer directed by Section 1415 as a whole: the "unfunded" liabilities are those transferred liabilities in excess of the transferred assets, which are "unfunded" in relation to those assets. This too is a plausible reading.

B. <u>The definition of "unfunded vested benefits" given in Part 1 of Subtitle E does not resolve the ambiguity</u>

Section 1415(c) appears in Part 2 of Subtitle E, which governs plan mergers and transfers of assets and liabilities. *See* 29 U.S.C. §§ 1411–15. Part 2 contains no definition of the term "unfunded vested benefits allocable to the employer."

The Old Plan refers us to the definition of the term "unfunded vested benefits" that is provided in Part 1 of Subtitle E, in Section 1393. In defining that term, Section 1393 instructs:

> For purposes of [Part 1], the term "unfunded vested benefits" means with respect to a plan, an amount equal to–
>
> (A) the value of nonforfeitable benefits [*i.e.*, liabilities] under the plan, less
>
> (B) the value of the assets of the plan.

*Id.* § 1393(c). As explained above, this formula is used in Part 1 to calculate the plan's collective "unfunded vested benefits"—the degree to which the plan as a whole is underfunded. Part 1 then directs the plan sponsor to determine the portions of those "unfunded vested benefits" that are "allocable to [the withdrawing] employer." *Id.* §§ 1381, 1391.

The Old Plan urges the Court to apply Section 1393(c)'s definition of "unfunded vested benefits" when interpreting Section 1415. It contends that we should rely on the "normal rule" of statutory interpretation "that identical words used in different parts of the same act are intended to have the same meaning." Appellant's Br. at 24 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993) (internal quotation marks omitted)). This is indeed a venerable principle. But it has no application here.

24

To begin, by its own terms the Section 1393(c) definition applies to "this part"—*i.e.*, Part 1—of the statute. Section 1415(c) appears in Part 2. This alone would be reason to doubt that this same-meaning rule should apply. *Cf. Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022) ("When Congress uses certain language in one section of the statute yet omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion of that language." (internal quotation marks omitted)).

In addition, Section 1415(c) refers not just to "unfunded vested benefits," but to "unfunded vested benefits *allocable to an employer*." 29 U.S.C. § 1415(c)(1) (emphasis added). That latter, longer phrase is not defined in Section 1393. It is, however, used in other places in Part 1: it refers to the portion of the old plan's unfunded liabilities for which the departing employer is deemed responsible under the statutory formulas. *See, e.g., id.* § 1391(a), (b)(1), (c)(2), (c)(3). That amount, after certain adjustments, becomes the employer's withdrawal liability. *Id.* § 1381(b)(1). So, in Part 1, "unfunded vested benefits allocable to the employer" would simply mean the employer's pre-adjustment withdrawal liability.

Importing this definition into Section 1415(c), as the Old Plan urges us to do, proves challenging. Section 1415(c) asks us to determine "the unfunded vested benefits allocable to the employer" that were "transferred by the plan sponsor of the old plan to the new plan . . . ." But withdrawal liability (either pre- or post-adjustment) is not transferred from the old plan to the new. Thus, if we strictly apply the rule that words should maintain a consistent meaning across Part 1 and Part 2, we would make little progress towards deciphering Section 1415(c).

Further, in determining ordinary meaning, "text may not be divorced from context," and so the "same words, placed in different contexts, sometimes mean different things." *United States v. Rosario*, 7 F.4th 65, 70 (2d Cir. 2021) (internal quotation

marks and citations omitted, alteration adopted). Parts 1 and 2 of ERISA's Subtitle E do fundamentally different things. As the District Court noted, Part 1—and the definition of "unfunded vested benefits" that it adopts—considers an old plan *as a whole*, looking at the old plan's health and stability, via the method it establishes for determining an employer's withdrawal liability. If the old plan as a whole is underfunded, then ERISA may require the departing employer to pay withdrawal liability, regardless of whether that employer is responsible for the deficit. In this context, therefore, a "vested benefit" is "unfunded" because it is not associated with assets in the communal pool. Part 1's definition of "unfunded vested benefits" accordingly focuses on the liabilities and assets of the whole plan. *See* 29 U.S.C. § 1393(c) (defining "unfunded vested benefits" as "the value of [liabilities] *under the plan*, less . . . the value of the assets *of the plan*") (emphases added)).

Part 2, in contrast, offers specific statutory protocols for mergers and for asset and liability transfers. As the District Court described, Part 2 focuses on "the liabilities and assets that will be transferred regarding a specific employer *without reference to* the . . . plan's [total] assets and liabilities." *Mar-Can Transp. Co.*, 722 F. Supp. 3d at 369 (emphasis added). Any transferred liabilities or assets become part of a new plan's communal pool. Depending on the health of the new plan, the transferred liabilities might ultimately be funded by corresponding assets, or they might not be. Whether these liabilities are funded or not funded, in this sense, depends partly on the liabilities and assets already in the new plan's pool—not solely on the assets or liabilities transferred. Because of this dependent relationship, the transferred assets and liabilities within an old plan as a whole are not dispositive in this context.

The Old Plan resists the conclusion that Part 1 focuses exclusively on a plan "as a whole," pointing out that Part 1 sometimes refers to "unfunded vested benefits that are allocated to specific employers." Appellant's Br at 24 (citing 29 U.S.C. §§ 1381(b)(1),

1389(a), and 1391). In those parts, however, the phrase "unfunded vested benefits" still refers to the liabilities of the entire plan; the statute simply allocates a slice of that broader pie to the withdrawing employer. *See id.* §§ 1381(b)(1), 1389(a), 1391(a).

We can identify one instance, however, where Part 1's use of "unfunded vested benefits" arguably does *not* refer to the unfunded liabilities of the entire plan. This is in Section 1391(e), which explains how courts should reduce withdrawal liability in the ordinary case of withdrawal, *i.e.*, when an employer is exiting for a reason other than its employees' change in bargaining representation. As described above, Section 1391(e) directs: "[i]n the case of a transfer of liabilities to another plan incident to an employer's withdrawal or partial withdrawal, the withdrawn employer's liability under this part shall be reduced in an amount equal to the value . . . of the transferred unfunded vested benefits." The parties agree that Part 1's definition of "unfunded vested benefits" applies here, and that Section 1391(e) therefore refers to "transferred liabilities minus any transferred assets." That is the same definition that the Old Plan asks us to apply in Section 1415(c).

Because Section 1391(e) is Section 1415(c)'s counterpart in Part 1—both deal with reductions in withdrawal liability—it deserves our particular attention. We are not persuaded that "unfunded vested benefits" must have the same meaning in the two sections, however. As an initial matter, besides the reference to "unfunded vested benefits," the two sections are very different in both structure and in word choice.[20] This

---

[20] Section 1391(e) provides:

> In the case of a transfer of liabilities to another plan incident to an employer's withdrawal or partial withdrawal, the withdrawn employer's liability under this part shall be reduced in an amount equal to the value, as of the end of the last plan year ending on or

27

is not a circumstance where Congress has "used verbatim much of the [same] language" in two parallel parts of a statute so that we can therefore assume that like words should receive like interpretations. *In re Soussis*, 136 F.4th 415, 439 (2d Cir. 2025). Instead, as noted above, among several pertinent differences, Section 1391(e) refers to "unfunded vested benefits," while Section 1415(c) refers to "unfunded vested benefits *allocable to the employer*."[21] 29 U.S.C. §§ 1391(e), 1415(c) (emphasis added). As we have explained, these two phrases refer to distinct concepts. Thus, in light of the different wording of each section, and the different contexts (Part 1 versus Part 2) in which each section appears, we cannot use Section 1391(e) to definitively deduce the meaning of Section 1415(c).

---

> before the date of the withdrawal, of the transferred unfunded vested benefits.

Section 1415(c) provides:

> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which—
> (1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds
>
> (2) the value of the assets transferred.

[21] Another relevant distinction is that Section 1391(e) refers to a "transfer of liabilities," while Section 1415(c) refers to a "transfer[] of the appropriate amount of assets and liabilities." This reflects that in the ordinary case (governed by Section 1391(e)), the old plan is not required to transfer any particular amount of assets, while in the change-in-bargaining-representation scenario (governed by Section 1415(c)), it is required to transfer the amount specified in Section 1415(g)(1). Thus, Congress may have presumed when drafting Section 1391(e) that in many (or even most) cases, the old plan would not elect to transfer any assets at all.

More generally, reviewing the entire text of the MPPAA, it is clear that Congress was not meticulous about using the same word or phrase to describe a particular concept throughout the statute. *See, e.g.*, 29 U.S.C. § 1415 (using the terms "liabilities," "nonforfeitable benefits," and "vested benefits" interchangeably). And understandably so, since as we explain in the next section, the legislative process involved months of negotiations and a series of piecemeal amendments. *See* 126 Cong. Rec. 20148 (July 29, 1980) (Senator Armstrong expressing concern that a "complex bill in which there have been literally hundreds of changes made in the last month or so" was "com[ing] to the floor without [an updated] committee report"). Section 1415 itself was a relatively late addition to the statute, coming months after Congress had settled on most of the key provisions in Part 1 of Subtitle E.

We therefore conclude that the term "unfunded vested benefits" need not carry the same meaning in both Parts. Part 1's definition of "unfunded vested benefits" does not resolve the ambiguity in Section 1415(c).

C.     The legislative structure, purpose, and history support Mar-Can's interpretation of Section 1415(c)

When interpreting a statute, we also "look to the statutory scheme as a whole" to inform our reading of the text. *See J.S. v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 76 F.4th 32, 38 (2d Cir. 2023) (internal quotation marks omitted). We cannot "construe each phrase literally or in isolation" and shut our eyes to the broader statutory context. *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009). This approach of searching for broader coherence is particularly important in the context of a complex statute like ERISA; the "true meaning of a single section" of such a statute, "however precise its language, cannot be ascertained if . . . considered apart from related sections." *Grajales*, 47 F.4th at 62 (quoting *Comm'r v. Engle*, 464 U.S. 206, 223 (1984)).

In addition, where the statutory text is ambiguous, we also consider the statute's stated purpose and its legislative history. *See King*, 894 F.3d at 477. In doing so, we favor an interpretation that advances the statute's "primary purpose" and that avoids "anomalous or unreasonable results." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) (internal quotation marks omitted).

Applying these principles here, we agree with Mar-Can that "unfunded vested benefits" in Section 1415 refers to the liabilities that are transferred from the Old Plan to the New Plan, without regard to the assets also transferred. The Old Plan's interpretation of Section 1415(c) would lead to a series of "anomalous or unreasonable results."

1. *The Old Plan's interpretation would create a windfall for the Old Plan and unfairly penalize employers that withdrew from a plan involuntarily because of a change in bargaining representative*

To start, if the Old Plan's reading is correct, Mar-Can's departure would result in a windfall for the Old Plan and the employers that remain in the pool: upon making the required transfers of liabilities and assets, the Old Plan would derive a net gain of $1.8 million (the difference between the value of the liabilities transferred and assets transferred). But Mar-Can would be entitled to no reduction at all in its withdrawal liability to account for this net gain, even though the amount of its withdrawal liability is based solely on pre-transfer liabilities under the old plan. It would be required to pay that full $1.8 million in withdrawal liability, without accounting for any net effect of the transfers. The Old Plan thus would receive a benefit totaling $3.6 million, and as a result, withdrawal liability would have functioned simply to double—not merely account for—the Old Plan's net gain from the transfers.[22] *See* H.R. Rep. 96-869, pt. 1, at

---

[22] The Old Plan points out that its interpretation does not *necessarily* result in a windfall, because "an employer's withdrawal liability is not the same thing as its 'allocable amount of unfunded

52 (1980) (explaining that withdrawal liability is intended to constitute an employer's "fair share of the plan's unfunded benefit obligations"). Given the MPPAA's overarching aim to "ensure[] that both plans are funded and avoid[] the possibility of double payments by the employer," *T.I.M.E.-DC, Inc.*, 756 F.2d at 946, we find it implausible that Congress could have intended this outcome.

Further, and even more implausible, the Old Plan's approach would treat employers that voluntarily withdraw from a plan more favorably than those that involuntarily withdraw because of a change of bargaining representative. As we have explained, in the ordinary case of withdrawal, Section 1391(e) directs the old plan to reduce withdrawal liability to account for the assets and liabilities transferred. The Section 1391(e) formula is as follows:[23]

$$\text{Reduction in Withdrawal Liability} = \text{Liabilities Transferred} - \text{Assets Transferred}$$

---

vested benefits.'" Appellant's Reply Br. at 22–23 (quoting 29 U.S.C. § 1381(b)). That is, an exiting employer transferring unfunded liabilities in an amount equal to its withdrawal liability does not *necessarily* leave an old plan fully funded or without unfunded liabilities allocable to that exiting employer because, in calculating withdrawal liability, Section 1381(b) requires up to four downward adjustments from the amount of allocable unfunded liabilities. *See, e.g., id.* § 1381(b)(1)(A) (requiring "any de minimis reduction applicable under [Section 1389]"). But that argument is nothing more than an observation that withdrawal liability, after any Section 1381(b) reductions, is an adjusted approximation of an exiting employer's obligation to fund the old plan. That withdrawal liability may not perfectly capture all allocable liabilities is of no moment; unless withdrawal liability fails to capture an old plan's continuing obligations to an exiting employer's employees *at all*, then having that employer pay the entirety of its withdrawal liability—when it already transfers liabilities in excess of that same amount—creates a windfall to the old plan.

[23] Section 1391(e) directs an old plan to reduce the withdrawal liability of an employer to account for the value "of the transferred unfunded vested benefits." Because this provision appears in Part 1 of ERISA's Subtitle E, that part's definition of "unfunded vested benefits" applies: the term means the value of vested benefits (liabilities) less the value of the assets. *See* 29 U.S.C. § 1393(c).

This is precisely the formula that Mar-Can suggests for the equivalent reduction when an employer withdraws from a plan incident to a change in bargaining representative.

The Old Plan's alternative reduction formula for such involuntary withdrawals, however, would count the assets transferred twice:

$$\text{Reduction in Withdrawal Liability} = \text{Liabilities Transferred} - 2\left(\text{Assets Transferred}\right)$$

Thus, under the Old Plan's rule, employers that were forced to leave a plan because their own workers voted to switch unions would receive a smaller reduction in withdrawal liability than employers that left voluntarily.

The Old Plan has never explained *why* Congress would purposefully create such a discrepancy. Recall that the statutory scheme was enacted in response to fears that employers would withdraw from plans after their employees' benefits had vested, but before satisfying their funding obligations, financially destabilizing the plan and leaving workers with a difficult choice. *See supra* Statutory Background Section I.B. Congress was concerned that employers would destabilize plans by voluntarily withdrawing from those plans, generating "chaos" and a "scramble to the exit." H.R. Rep. No. 96-869, pt. 1, at 224 (1980) (statements by Rep. Erlenborn, *et al.*). Accordingly, withdrawal liability requires compensation by employers that seek to leave an underfunded plan without paying their fair share of that plan's liabilities.

But under Section 1415, the employer has not voluntarily withdrawn from a plan for self-interested reasons—it has been forced to withdraw because its employees have changed bargaining representatives. The Old Plan's reading of Section 1415 would paradoxically create a higher withdrawal liability (due to a smaller reduction in that liability), making it more expensive for the workers themselves to leave a plan when they choose a new union. It would be odd for Congress to require employers to pay additional withdrawal liability in this scenario.

The Old Plan points to nothing in the legislative history to suggest that this type of involuntary withdrawal was part of the rush-for-the-exit problem that Congress addressed in the MPPAA. That history does not indicate that Congress believed the employees' choice to switch unions should lead to greater withdrawal liability for the employer. If anything, it suggests the opposite.

The MPPAA grew out of a congressionally mandated PBGC study that proposed withdrawal liability as one of several solutions to the growing "problem of employer withdrawals." *Gray*, 467 U.S. at 722–23 & n.2 (citing *Pension Plan Termination Insurance Issues: Hearings Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 95th Cong. 22 (Sept. 28, 1978) (statement of Matthew M. Lind, Executive Director, Pension Benefit Guaranty Corp.)). Under the PBGC proposal, withdrawal liability "would be assessed when a withdrawal occur[ed] irrespective of the reasons for the withdrawal, and irrespective of whether the union, the employer, or both initiate[d] the withdrawal." PBGC, Multiemployer Study Required by P.L. 95-214, at 101 (July 1, 1978). The PBGC included in this category those employers that were forced to withdraw because their employees "vote[d] to decertify their bargaining representative." *Id.* Accordingly, early versions of the bill that became the MPPAA drew no distinction between employers that withdrew because of a change in bargaining representative, and other withdrawing employers. *See, e.g.*, H.R. 3904, § 104 (as introduced in the House, May 3, 1979); *see also* H.R. Rep. No. 96-869, pt. 1, at 2, 7–32 (1980) (describing withdrawal liability provisions as of April 2, 1980).

As Congress revised the bill, however, it heard testimony from several witnesses who opposed the imposition of withdrawal liability on employers that were forced to withdraw because of a union vote. One labor attorney told Congress, for instance, that the initial approach taken would undermine employees' right to "select their exclusive [collective] bargaining representatives," and place "labor organizations in the

[improper] role of attempting to require employees to continue participating in a pension plan." *The Multiemployer Pension Plan Amendments Act of 1979: Hearings on S. 1076 Before the S. Comm. on Lab. & Hum. Res.*, 96th Cong. 734 (June 1979) (letter of Wayne Jett, labor attorney). Taking a different tack, a witness representing construction employers warned that unions could "use the threat of withdrawal liability" to pressure an "uncooperative employer" in CBA negotiations. *Hearing on H.R. 3904 Before the H. Comm. on Ways & Means*, 96th Cong. 130 (Feb. 1980) (statement of John W. Prager, Jr., counsel, Associated Builders & Contractors, Inc.). He also argued that employees might "be coerced into voting for rather than against a union because of possible financial jeopardy to their employer if they do not." *Id.*; *see also id.* at 139 (statement of Frank J. White, Jr., President, Associated General Contractors of Connecticut, Inc.) (warning that the bill would "destroy the integrity of collective bargaining").

In June 1980, three months before the bill's enactment, the Senate Finance Committee discussed whether to add a provision to protect a small employer in the event of a union-initiated withdrawal, such as a union decertification vote. *See The Multiemployer Pension Plan Amendments Act of 1980: Executive Session on S. 1076 Before the S. Comm. on Fin.*, 96th Cong. 4 (June 12, 1980). A member of the Committee staff explained that while similar "concern[s] ha[d] been raised by a number of folks," the drafters had concluded that it would be too challenging to verify whether a withdrawal was truly union-initiated, rather than employer-initiated. *Id.* The Committee ultimately voted to add a provision to the bill directing the PBGC to study whether Congress should adopt "special rules" for union-mandated withdrawals. *Id.* at 93–94; *see also* MPPAA, Pub. L. No. 96-364, § 412(a)(1)(B), 94 Stat. 1208, 1309 (enacting provision).

The next month, as an apparent additional concession to the fairness concerns related to union-vote-driven withdrawals, Congress added the first part of what would become Section 1415. *See* 126 Cong. Rec. 20160 (July 29, 1980). The thrust of the

provision was that, in the event of an employer withdrawal incident to certified change of collective bargaining agent, the old plan would be required to transfer to any new plan the liabilities and assets associated with the active employees who were switching plans. *Id.*; *see also* Joint Explanation of S. 2076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong. Rec. at 20199 (July 29, 1980). The part of the statute that would become Section 1415(c) was subsequently added with little fanfare. *See* 126 Cong. Rec. at 20185, 20187 (adding the reduction provision as part of a lengthy series of "technical and conforming changes to the committee bill").

Thus, for months preceding the MPPAA's enactment, various stakeholders expressed concerns that imposing withdrawal liability after a vote to change bargaining representatives would be unfair to both workers and employers. Congress was apparently receptive and made certain concessions. And more broadly, the MPPAA was designed to improve labor-management relations and facilitate collective bargaining, not to exacerbate tensions. *See, e.g.*, 29 U.S.C. § 1001a(4)(A) (statement of legislative purposes); *Hearings on H.R. 3904 Before the Subcomm. on Lab.-Mgmt. Rels. of the H. Comm. on Educ. & Lab.*, 96th Cong. 363 (1979) (statement of Ray Marshall, Secretary of Labor, opining that the bill would "improve collective bargaining"). We think it unlikely in this setting that Congress intended to enact a statute that would (under the Old Plan's reading) impose a significant additional burden on the employer where withdrawal occurred because unionized employees exercised their right to choose a new union representative.

> *2. Mar-Can's reading is more consistent with other parts of Section 1415*

Mar-Can's reading of Section 1415(c) also harmonizes that provision with the rest of Section 1415. In contrast, the Old Plan's reading would undermine the apparent purposes of two other parts of Section 1415: Sections 1415(g) and 1415(f).

- <u>Section 1415(g)</u>

Section 1415(g)(1) directs an old plan's sponsor to determine the "appropriate amount of assets" that it should transfer by calculating "the amount by which the value of the nonforfeitable benefits to be transferred [*i.e.*, the liabilities transferred] exceeds the amount of the employer's withdrawal liability to the old plan . . . ." 29 U.S.C. § 1415(g)(1). So, in a situation where liabilities transferred by an exiting employer do *not* exceed that employer's withdrawal liability, Section 1415(g)(1) would not apply, and the old plan would not be required to transfer any assets to the new plan. Otherwise, the sponsor first determines the difference between the liabilities being transferred and the withdrawal liability and then transfers assets of that amount. *See* 29 U.S.C. § 1415(b)(3) ("[T]he plan sponsor of the old plan *shall* transfer the appropriate amount of assets and liabilities to the new plan." (emphasis added)).

Congress's inclusion of Section 1415(g)(1) suggests that it intended an employer's payment of withdrawal liability to serve as the sole mechanism for the old plan to offload liabilities without a corresponding transfer of assets: whenever the liabilities to be transferred (under Section 1415(b)(2)(A)(ii)) *exceed* withdrawal liability, Section 1415(g)(1) directs the old plan to make up the difference by transferring assets in the amount of that excess (the "appropriate amount of assets"). In other words, the only liabilities that the old plan can offload *without* a corresponding asset offset are accounted for by the withdrawal liability payment mechanism. Any required transfer of liabilities beyond that amount requires parallel transfers of liabilities *and* assets, which produce a net zero effect on the old plan. Thus, under Section 1415(g)(1), as the amount of excess liabilities to be transferred increases, so too does the amount of assets the old plan is required to transfer alongside those liabilities in order to neutralize the impact on the old plan of the liability transfer.

Applying Mar-Can's reading of Section 1415(c) makes it the mirror image of Section 1415(g)(1) for the assets side of the ledger: when assets are being transferred, Section 1415(c) decreases the reduction in withdrawal liability—that is, it increases the final withdrawal liability the old plan is entitled to collect—by the amount of that asset transfer, thereby neutralizing the impact on the old plan of the asset transfer. Just as before, this keeps withdrawal liability as the only liabilities offloaded by the old plan without a corresponding transfer of assets because Section 1415(c) ensures any transfer of assets has a corresponding liability offset, creating a net zero effect on the old plan. Thus, Section 1415(g)(1) and Section 1415(c) work in tandem to stabilize both the liability and asset sides of the withdrawal from the old plan to the new.

In contrast, the Old Plan's reading of Section 1415(c), in combination with Section 1415(g)(1), would produce an incongruous result. Again, Section 1415(g)(1) requires liabilities in excess of withdrawal liability to have a net zero effect. But under the Old Plan's reading, Section 1415(c) is asymmetrical: every dollar in assets transferred out of the old plan results in a two-dollar increase in withdrawal liability (by effecting a two-dollar decrease in the reduction of withdrawal liability). This smaller liability offset creates a net windfall for the old plan, since it collects more withdrawal liability than assets transferred out. *See supra* Discussion Section I.

This is the undesirable—and, we conclude, unintended—result that would emerge if we combined the Old Plan's reading of Section 1415(c) with Section 1415(g)(1).[24]

---

[24] To further illustrate the incongruity, take the following hypothetical. Imagine that a departing employer owes $10 million in pre-reduction withdrawal liability to the old plan, and Section 1415(a) requires the old plan to transfer the same amount of liabilities to the new plan and no assets in the first instance. Accordingly, under Section 1415(g)(1), the old plan would need to transfer $0 in assets—there would be no gap between liabilities transferred and withdrawal

- Section 1415(f)

Similarly, the Old Plan's reading of Section 1415(c) would undermine another part of Section 1415: its withdrawal liability floor. In its subsection (f)(2), Section 1415 sets a *minimum* amount of withdrawal liability that the employer will owe if it switches plans because of a change in collective bargaining representative, and then switches plans again within twenty years. At the second switch, the employer will pay the greater of (1) its withdrawal liability, calculated according to the ordinary procedure; or (2) the withdrawal liability reduction it received under Section 1415(c) when it

---

liability to fill. In turn, the Old Plan's formula would reduce the employer's withdrawal liability by $10 million: the liabilities transferred ($10 million) minus twice the assets transferred ($0). The employer would owe nothing to the old plan.

Now imagine instead the same amount of pre-reduction withdrawal liability ($10 million), but this time, Section 1415(a) directs the old plan to transfer a greater amount of liabilities to the new plan—say, $15 million—and still no assets in the first instance. (Such a situation might arise, perhaps, because more active employees are switching plans.) Suddenly, the value of the liabilities transferred ($15 million) would exceed withdrawal liability ($10 million), and Section 1415(g)(1) would require the old plan to transfer assets worth $5 million to the new plan. With the transfer of assets, the Old Plan's doubling-of-assets formula would truly kick into gear. The employer would be entitled to only a $5 million reduction in withdrawal liability: the value of the liabilities transferred ($15 million) minus twice the value of the assets transferred ($10 million). After this $5 million reduction, the employer would still owe $5 million in withdrawal liability to the old plan.

Accordingly, under the Old Plan's reading, we reach a counterintuitive result. In the second scenario, the employer's new plan takes on $5 million more in liabilities, and the employer ends up owing $5 million more in withdrawal liability to the old plan. The second-scenario employer is worse off than the first-scenario employer in material terms: its new plan took on $10 million more in liabilities than assets (as in the first scenario), but it still owes the old plan $5 million in withdrawal liability ($5 million more than in the first scenario). In effect, the second-scenario employer is arbitrarily penalized for having a greater number of active employees switching plans.

This pattern continues in any scenario where the liabilities transferred exceed withdrawal liability. For each dollar of liabilities transferred from old plan to new, the employer's final withdrawal liability owed (after reduction) increases by a dollar, until it reaches a maximum at the full initial amount (in these hypotheticals, $10 million).

withdrew from the prior plan, subject to a five-percent annual abatement. In other words, Section 1415(f)(2) provides a floor below which the withdrawal liability to the new plan may not fall during that twenty-year period.

The floor provision protects against the risk that the statutory withdrawal-liability formula will generate a number that is unreasonably low. For example, an employer that has switched to a second plan may have a low withdrawal liability under the presumptive method, because that method relies on the employer's history of contributions to the plan. An unscrupulous employer might decide to switch plans again, so that it could offload its liabilities without paying its fair share in withdrawal liability. To discourage that type of opportunism, Section 1415(f)(2) sets a baseline below which the employer's withdrawal liability cannot fall: the Section 1415(c) reduction the employer received when it previously switched plans. And because this floor is higher when the employer first joins (before the five-percent annual abatement kicks in), Section 1415(f)(2) discourages rapid switching between plans, which could be particularly destabilizing.

Using Mar-Can's calculation of the Section 1415(c) reduction, it makes sense for Section 1415(f)(2) to set its floor at that amount. At the first switch, Mar-Can's formula would have the employer's Section 1415(c) reduction equal the value of the liabilities transferred into the second plan, minus the value of any assets transferred. When the employer then switched to a third plan, it would at minimum be required to compensate the second plan for the excess liabilities it brought when it arrived at that plan. Section 1415(f)(2) would prevent the employer from leaving the second plan without paying its fair share in withdrawal liability.

Under the Old Plan's interpretation, however, the amount of a Section 1415(c) reduction is "*significantly smaller*" than that yielded by the approach that Mar-Can proposes. *Hoeffner*, 2016 WL 8711082, at *11. In fact, in many cases the employer's

withdrawal liability would be subject to no reduction. If so, Section 1415(f)(2) would set no floor for the employer's withdrawal liability in a subsequent switch in plans. This would create a loophole that some less scrupulous employers might exploit.

As described above, the MPPAA was enacted precisely to disincentivize employer withdrawal from multiemployer pension plans. In light of this purpose, we will not construe an ambiguous term to encourage the opposite outcome. The Old Plan offers no persuasive response to the possibility that Section 1415(f)(2) will be abused under its reading of the statute, except to say that these concerns are "highly speculative." Appellant's Br. at 36–37. Even if that is true, the inclusion of Section 1415(f)(2) suggests that Congress was worried about the incentives described above. Under Mar-Can's and the District Court's reading of the statute, the Section 1415(f)(2) floor provides a solution to this problem. The Old Plan does not otherwise explain the need for Section 1415(f)(2). The structure of Section 1415, and the presence of Section 1415(f)(2), therefore weigh against the Old Plan's proffered interpretation.

## CONCLUSION

The District Court correctly rejected the Old Plan's reading of Section 1415(c). Upon review, it is apparent that Part 1's definition of "unfunded vested benefits" cannot be transplanted into Part 2's Section 1415(c). Doing so would require us to disregard Section 1415(c)'s full text and its statutory surroundings, including its placement in Part 2 and its interrelationship with Sections 1415(g)(1) and (f)(2). Adopting the Old Plan's formula, moreover, results in outcomes that are squarely at odds with the policy goals underlying the MPPAA.

Having considered the text, structure, legislative purposes, and history of Section 1415, we agree with the District Court's construction of the statute. The term "unfunded vested benefits allocable to the employer" as used in Section 1415(c) refers to the entire

amount of liabilities transferred to an employer withdrawing from a multiemployer ERISA plan pursuant to Sections 1415(a) and (c). The judgment of the District Court requiring the Old Plan to transfer pension assets and liabilities and reducing Mar-Can's withdrawal liability by $1.8 million, is therefore **AFFIRMED**. Mar-Can's cross-appeal is **DISMISSED** as moot.